**UNITED STATES of America, Appellee,**

v.

**Donna June ROUSE, Appellant.**

**No. 97–3134.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1998.

Decided March 23, 1999.

Howard B. Katzoff, appointed by the court, argued the cause and filed the brief for appellant.

Barbara A. Grewe, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, John R. Fisher and Katherine Winfree, Assistant U.S. Attorneys. Elizabeth H. Danello, Assistant U.S. Attorney, entered an appearance.

Before: RANDOLPH, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Following her conviction on nine counts of fraud and 11 counts of money laundering, appellant moved for a new trial based on what she claimed to be "newly discovered" evidence that her co-defendant had abused her physically, sexually, and emotionally. She argued that she became able to admit the abuse only after undergoing posttrial counseling and that the abuse precluded her from having the requisite criminal intent. Relying on this history of abuse, appellant also requested a downward departure in sentencing on grounds of diminished mental capacity, duress, and coercion. Mindful of the deferential standard of review applicable to district court credibility determinations, we affirm the district court's rejection of these and other claims.

I

A federal grand jury indicted appellant Donna Rouse, as well as Pamela Glascoe and Richard Gartmon, on charges of interstate transportation of securities obtained by fraud, 18 U.S.C. § 2314 (1994), and money laundering, *id.* § 1956(a)(1). Rouse and Gartmon proceeded to trial, while Glascoe pled guilty and testified for the government. Rouse and Gartmon were convicted and sentenced to prison for 57 months and 120 months, respectively. In a separate appeal, we affirmed Gartmon's conviction and sentence. *See United States v. Gartmon,* 146 F.3d 1015 (D.C.Cir.1998).

The indictments arose from a scheme to defraud the George Washington University Health Plan of over $450,000. Glascoe, a secretary in the Health Plan's marketing and sales department, prepared check requests authorizing sponsorships of local events and programs as well as payments to vendors for services purchased by the Health Plan. Upon approval by Health Plan executives, checks were issued by the finance department. Glascoe had no authority to approve or sign check requests.

Glascoe and Gartmon began dating in November 1994. At Gartmon's request, Glascoe

soon began submitting check requests for fictitious sponsorships. She gave the issued checks to Gartmon. Because Health Plan employees knew that Glascoe was dating Gartmon, she never requested checks in his name. Instead, Gartmon gave her the names of three women to use on the checks. One was Donna Rouse, another Gartmon girlfriend.

On January 11, 1995, Glascoe created a request for a $5,500 check to Rouse for sponsorship of a fictitious "clean air challenge." The Health Plan issued the check, Glascoe gave it to Gartmon, and Rouse endorsed it, deposited it in her personal bank account, and received $1,000 cash back from the teller. Glascoe never met or spoke to Rouse. Rouse never organized any events featuring the Health Plan as a sponsor.

Glascoe also submitted fraudulent invoices for services from a printing company owned by one of Gartmon's friends. Eight times between January and March 1995, Glascoe typed up invoices and corresponding check requests, each time naming Rouse as payee. Glascoe also drafted phony contracts to support the invoices. Ranging from $16,800 to $84,600, the eight checks totaled $438,000. Rouse personally endorsed and deposited six of the eight checks into her checking account. Using a deposit slip for Rouse's account, Gartmon's cousin deposited the seventh. It was unclear who deposited the eighth. During this time, Rouse opened a money market account, depositing large sums there as well.

Rouse never performed any printing services, nor was she ever employed by the printing company. Searching Rouse's home, the police found a phony civil complaint signed by Rouse, which alleged that the Health Plan had failed to fulfill a contract for printing services. The complaint falsely claimed that Rouse was vice-president of the printing company and that the company had printed materials for the Health Plan.

Rouse gave Gartmon most of the money from the fraudulently obtained checks, although she never wrote checks from her accounts in his name. Instead, knowing that the money was for Gartmon, she wrote checks and obtained cashier's checks payable to Gartmon's other girlfriends, his friends,

and various businesses. Gartmon used the money to make and repay loans and to buy three sports cars, a hair salon, and a jacuzzi and gazebo for his house. In all, Rouse gave Gartmon's surrogates 11 checks ranging from $3,000 to $23,000. These checks totaled $140,000.

After a jury convicted Rouse on nine counts of criminal fraud and 11 counts of money laundering, she filed three posttrial motions that are now at issue in this appeal. First, she moved for acquittal notwithstanding the verdict, claiming that the evidence was insufficient to support the verdict. The district court denied the motion. Second, eight months after her conviction, she moved for a new trial based on "newly discovered" evidence that she had suffered "battered woman's syndrome" during her 14-year relationship with Gartmon. According to Rouse, that syndrome precluded her from having the requisite criminal intent under the fraud and money laundering statutes. Despite a psychiatrist's testimony that Rouse had endured severe sexual, physical, and emotional abuse by Gartmon during the time of her criminal conduct, the district court determined that the abuse was not "newly discovered" and refused to order a new trial. Finally, Rouse requested a downward departure from the applicable sentencing guidelines based on diminished mental capacity and coercion or duress. Following an evidentiary hearing in which Rouse testified for the first time, the district court found her claims not credible and sentenced her to a 57-month prison term, the maximum sentence under the guidelines. We consider each of the district court's rulings in turn.

## II

We begin with Rouse's claim of evidence insufficiency. Challenging the fraud counts, Rouse argues that the government failed to prove that she knew the checks she endorsed or deposited were obtained by fraud. According to Rouse, while the evidence showed that Glascoe and Gartmon colluded in the fraud, it failed to show that either Glascoe or Gartmon told Rouse the source of the checks.

Rouse further argues that even if the evidence showed that she had the requisite knowledge by the end of the scheme; it failed to show that she knew of the fraud at the time each check was transferred to her, as the fraud statute requires. *See* 18 U.S.C. § 2314. With respect to the money laundering counts, Rouse argues that the government failed to prove that she knew that the money she gave Gartmon was obtained illegally or that her purpose in writing the checks was to conceal Gartmon's ownership or control of the money. *See id.* § 1956(a)(1). Overall, Rouse's theory is that she was an unknowing victim of Gartmon's schemes and deceits.

In assessing claims of evidence insufficiency, we view the evidence in the light most favorable to the government, drawing all reasonable inferences in the government's favor. Our inquiry is "limited to the question of whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Dingle,* 114 F.3d 307, 310 (D.C.Cir.1997) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We must affirm the conviction unless we conclude that "a reasonable juror *must necessarily* have had a reasonable doubt as to the defendant['s] guilt." *United States v. Weisz,* 718 F.2d 413, 437 (D.C.Cir.1983).

▇ Applying this standard, we find no basis for setting aside the jury's verdict. As to the fraud counts, the evidence shows that Rouse never applied for any sponsorships from the Health Plan, that she performed no services for the Health Plan, and that she had no contact with any Health Plan employee responsible for submitting or approving check requests. The evidence also shows that, during the four months prior to the deposit into her accounts of nine checks ranging from $5,500 to $84,600, Rouse carefully monitored her bank accounts, made no deposits larger than $944, and kept an average balance no greater than $235. Acting on the sensible assumption that Rouse knew that organizations do not hand out large checks for no reason, a rational jury could conclude from this evidence that Rouse knew that each check issued to her was illegiti-

mate. The physical evidence recovered from Rouse's home—the phony civil complaint signed by Rouse falsely claiming that she was vice-president of a printing company and that the company had provided printing services for the Health Plan—further supports the finding that Rouse knew the checks were obtained by fraud.

▇ With respect to the money laundering counts, the evidence shows that Rouse knew that the large checks she wrote were used to buy goods and services for Gartmon's benefit, even though none of the checks bore Gartmon's name. The evidence also shows that when Rouse wrote small checks on Gartmon's behalf in the past, she consistently noted the check's purpose on the memo line of the check; the large checks she wrote for Gartmon carried no such notation. Along with the evidence that Rouse knew that the money she was spending for Gartmon's benefit was obtained illegally, these facts provide sufficient grounds for a rational jury to infer that Rouse knew that the checks she wrote for Gartmon served to conceal his ownership or control of the illegally obtained funds.

### III

We turn next to Rouse's challenge to the district court's denial of her motion for a new trial. Arguing that she became able to reveal Gartmon's physical, sexual, and emotional abuse only after undergoing post-trial psychotherapy, Rouse claimed that this "newly discovered" evidence could lead a new jury to find that she participated in the fraud only to avoid Gartmon's abuse and that she therefore lacked the requisite criminal intent.

The facts leading up to Rouse's claim of "newly discovered" evidence are as follows: Before trial began, the government alerted Rouse's lawyer to the possibility that Gartmon had abused Rouse, referring the lawyer to entries in Rouse's diary mentioning acts of violence, forced sex, and threats by Gartmon during the three-month period of the charged conduct. The government also gave Rouse's lawyer a tape recording of a pre-indictment interview in which Rouse told a prosecutor that although she loved Gartmon, she was afraid of him. During the interview, Rouse

also said that Gartmon had been verbally and physically abusive, and that not wanting to upset Gartmon, she asked no questions when he told her to deposit or write checks. Asked by her lawyer about her diary entries and the tape recording, Rouse denied having been abused and rejected his suggestion that she see a psychologist with experience working with battered women. Rouse never testified at trial, and her lawyer presented no claim or evidence of abuse to the jury.

Between conviction and sentencing, Rouse underwent 11 months of psychotherapy with a clinical social worker, during which she admitted that her relationship with Gartmon had been abusive for many years. The social worker referred Rouse to a psychiatrist. Examining Rouse for seven hours over two days, the psychiatrist prepared a report finding that on numerous occasions over a 10-year period, Gartmon hit her, raped her, and forced her to have sex with another man. *See* Letter from Dr. Susan J. Fiester to Howard Katzoff of 12/2/96, at 6–8. Through this constant abuse, the report stated, "Mr. Gartmon was able to terrorize Ms. Rouse and to virtually control her life." *Id.* at 15. According to the psychiatrist, Rouse's "compliant, even servile behavior" in response to Gartmon's requests that she open accounts, deposit checks, and provide him money "is typical of a woman who has been severely battered." *Id.* Concluding that "Ms. Rouse is clearly suffering from the Battered Woman Syndrome," the report explained:

> [A]s a battered woman, she came under [Gartmon's] control, and, as a result of coercion and duress, experienced a diminished ability to make appropriate decisions regarding her behavior.... [Her] criminal activity was directly related to her abusive relationship with Mr. Gartmon, specifically: 1) her chronic fear of being beaten and sexually abused; 2) the depression and anxiety which occurred as a consequence, and 3) her need to deny reality in the interest of minimizing any type of conflict with Mr. Gartmon because that conflict would likely lead to serious physical abuse.

*Id.* at 17. The report further stated that "[i]t is an essential part of the battering relationship for the victim to conceal the fact of the abuse from others for a variety of reasons including denial and fear of physical harm...." *Id.* at 18. "Ultimately," according to the report, "Ms. Rouse's ability to recognize and accept the tragic reality of her abuse by Mr. Gartmon evolved from an internal process fostered by her psychotherapeutic treatment and could not have emerged even with aggressive external probing [by] the Government or her attorney." *Id.*

Relying on the psychiatrist's report, Rouse moved for a new trial, claiming that the "newly discovered" evidence of abuse, "unlocked" by post-trial psychotherapy, could lead a jury to conclude that she was merely a passive participant in the fraud and thus lacked criminal intent. Summarizing her report at the hearing on the motion, the psychiatrist testified that Rouse's fear of Gartmon's abuse made her susceptible to doing or believing whatever he told her during the period of the charged conduct, and that her state of severe denial prevented her from reporting the abuse. Rouse chose not to testify.

■ The government never disputed that Rouse had suffered physical, sexual, and psychological abuse by Gartmon. Instead, it argued that she and her lawyer knew of the abuse and that she had the capacity to introduce it at trial but simply chose not to. The district court agreed, ruling that the evidence of abuse was not "newly discovered." As long as the district court did not misapply the law or abuse its discretion, we must affirm. *See United States v. Kelly,* 790 F.2d 130, 133 (D.C.Cir.1986).

■ In reaching its conclusion, the district court relied on the following findings: (1) Rouse's entries in her diary and her statements in the pre-indictment interview showed that she was capable of acknowledging the abuse before trial; (2) aware that Rouse had been abused, her lawyer advised her to seek counseling, but she refused; (3) because Gartmon was incarcerated before trial, he was unable to harm Rouse physically; (4) because Rouse did not live with Gartmon, had no children with him, and did not depend on him financially, she had little reason to fear reprisal for reporting the abuse; and (5) having been convicted, Rouse had a

strong motive for feigning an inability to discuss the abuse at the time of trial.

We think these findings are less probative than they might first appear. That Rouse mentioned the abuse in her personal diary says little about her ability to report the abuse to others. Her admission of abuse in the pre-indictment interview, moreover, consisted of nothing more than the following dialogue:

> Prosecutor: You must have a specific reason for feeling . . . that you had no choice [but to continue in the fraud scheme]. There must be more than a vague feeling that you didn't know what his reaction would be.
>
> Rouse: I mean, I didn't want any verbal, mental, physical abuse, like, towards me.
>
> Prosecutor: Is he verbally abusive towards you?
>
> Rouse: Sometimes.
>
> Prosecutor: Physically?
>
> Rouse: Sometimes.

7/12/95 Interview Tr. at 44. We likewise suspect that the district court may have relied too heavily on the fact that Rouse was not under Gartmon's physical control. According to the psychiatrist, Rouse was unable to report the abuse because she was *psychologically* debilitated by denial and fear:

> [T]he simple physical factors of having a place to go already, [having] a job or resources, is [sic] only a piece of the situation. One can't ignore the very powerful psychological aspect of the attachment. . . .
>
> .    .    .    .    .
>
> [I]f a woman doesn't have kids and may have a place to go, the psychological factors may play a much more powerful role in why they're essentially stuck and incapacitated and staying in that relationship.

2/6/97 Mot. Hearing Tr. at 76–77. Indeed, an entry in Rouse's diary reveals that Rouse went to Gartmon's house to cook him breakfast and wash his clothes just two days after he hit her in the eye and forced her to have sex with another man. In the context of this and other self-defeating behavior detailed in the psychiatrist's report, Rouse's refusal to seek psychotherapy before trial, viewed by the district court as a free and rational choice to "stand by [her] man," *id.* at 61, could just as easily be evidence of her chronic state of denial and fear.

In the end, however, because the burden of proof was on Rouse, and because our standard of review is highly deferential, we cannot say that the district court abused its discretion. The court did not reject the existence of battered woman's syndrome as a general matter, nor did it summarily reject Rouse's claim of "newly discovered" evidence. Instead, the court reviewed the psychiatrist's report, carefully questioned the psychiatrist during the hearing on Rouse's motion, and gave Rouse's lawyer ample opportunity to explicate her claim. Aware of the incentives facing Rouse after being convicted, the district court asked the psychiatrist whether "avoid[ing] punishment [could have been] a motivation" for Rouse to allege an inability to report the abuse earlier. *Id.* at 84. The psychiatrist responded: "[I]t's not really my professional expertise to determine if somebody is lying or telling the truth" and that "opportunism" could have been a motive for Rouse's claim. *Id.* at 84. Unconvinced that the psychiatrist had adequately verified Rouse's truthfulness, the district court said: "We're on the eve of sentencing. So, why didn't the doctor focus on that? Why didn't she attach any significance to these revelations being made at the eleventh hour? That's very significant, in my view." *Id.* at 130. The court concluded that Rouse "knew what was going on in her life" and chose not to bring it forward at trial. *Id.* at 133.

Since the district court had legitimate concerns about Rouse's credibility given the timing of her claim, and since the court had understandable doubts about the psychiatrist's report and testimony, we see no grounds for withholding the deference we ordinarily give to a district court's credibility determinations. *See Carter v. Bennett*, 840 F.2d 63, 67 (D.C.Cir.1988) ("The district court's credibility determinations are entitled to the greatest deference from this court on appeal."). Although the evidence in this case might support a different conclusion, that

possibility does not warrant a finding that the district court abused its discretion. We thus affirm the denial of Rouse's motion for a new trial.

## IV

After the district court denied her new trial motion, Rouse sought a downward departure on the grounds of diminished mental capacity and coercion or duress. *See* U.S.S.G. §§ 5K2.12–.13. At her sentencing hearing, Rouse testified for the first time, claiming that Gartmon's abuse effectively compelled her to participate in the fraud and money laundering scheme or, alternatively, weakened her ability to resist such participation. Observing that Rouse was "very articulate, sophisticated, [and] very intelligent," the district court found "absolutely incredible" and "preposterous" her testimony that she simply did whatever Gartmon told her to do and that she knew nothing about the source or amount of money going into and out of her bank account during the period of the charged conduct. 9/19/97 Sentencing Hearing Tr. at 7–8, 10. Struck by Rouse's "total lack of candor," *id.* at 64, the court rejected her claim that Gartmon's abuse had debilitated her to such an extent that she was unable to control her own actions. Deferring again to the district court's credibility determination, we see no grounds for disturbing its decision to deny Rouse a downward departure. *See United States v. Leandre,* 132 F.3d 796, 800 (D.C.Cir.1998) (district court's downward departure decision must be upheld on appeal in the absence of "a mistake of law or an incorrect application of the Guidelines").

## V

We affirm Rouse's conviction and sentence.

*So ordered.*