Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 18, 2003       Decided April 11, 2003

No. 02-3020

UNITED STATES OF AMERICA,
APPELLEE

v.

JASON HART,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00198–01)

*Erica J. Hashimoto*, Assistant Federal Public Defender, argued the cause for the appellant. *A. J. Kramer*, Federal Public Defender, was on brief. *Maria D. Jankowski*, Assistant Federal Public Defender, entered an appearance.

*Michael T. Truscott*, Assistant United States Attorney, argued the cause for the appellee. *Roscoe C. Howard, Jr.*, United States Attorney, *John R. Fisher, Roy W. McLeese III*

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

and *Catherine Sheehan*, Assistant United States Attorneys, were on brief.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* SENTELLE.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The appellant, Jason Hart, seeks reversal and remand of the district court's January 2002 judgment sentencing him to 82 months in prison. *See* App. of Appellant at 50–56; Sentencing Tr. at 131–39. He contends that the court: (1) erred as a matter of law in interpreting section 2K2.1(b)(5) of the United States Sentencing Guidelines (U.S.S.G. or Guidelines) to apply to a "felony offense" neither temporally nor factually related to the offense of conviction, *see* Br. of Appellant at 14–20; (2) admitted unreliable hearsay evidence and placed an impermissible burden on him to demonstrate the hearsay declarant's lack of bias against him, *see id.* at 28–33; and (3) failed to make clear the specific factual basis on which it rested its conclusion that a four-level enhancement was appropriate under section 2K2.1(b)(5), *see id.* at 20–28. Although Hart's first two challenges are unavailing, the third has merit. Accordingly, and for the reasons set forth in Part II.C, *infra*, we reverse and remand the case for resentencing with instructions to resolve the ambiguities in the sentencing court's application of section 2K2.1(b)(5).

## I.

Hart was arrested in April 2001 while in possession of a .32 caliber Colt semiautomatic handgun and a .38 caliber Colt special revolver. In June a grand jury indicted him on one count of unlawful possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1). *See* App. of Appellant at 6. Hart pleaded guilty. At sentencing the government sought an upward adjustment in his Guidelines offense level pursuant to U.S.S.G. § 2K2.1(b)(5), which provides for a four-level enhancement

[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense . . . .

U.S.S.G. § 2K2.1(b)(5). The government asserted that Hart "used or possessed" the .32 caliber gun "in connection with" the February 25, 2001 homicide of one David Jones.[1] *See* App. of Appellant at 41–44; *see also* Br. of Appellee at 10. The district court conducted an evidentiary hearing in January 2002 to determine whether there was a factual basis for the four-level enhancement.

### A.

At the hearing, the government offered the testimony of four police officers—Todd Gray, Nicholas Viggiani, Kerry Jernigan and Jeffrey Eckrich—from the Washington, D.C. Metropolitan Police Department and the Prince George's County Police Department. It also introduced a hearsay statement by Theodore Scott, who allegedly sold Hart the .32 Colt in January 2001, and several ballistics reports indicating that the gun was used in a number of shootings that took place in January and February 2001. The evidence can be summarized as follows:

*First*, Detective Viggiani investigated the January 18, 2001 shooting of Danielle Duncan and he arrested and interviewed Scott in connection therewith. *See* Sentencing Tr. at 31–40 (Det. Viggiani). During Viggiani's questioning, Scott admitted that he shot Duncan—with a .32 Colt—but claimed it was an accident. *See id.* at 38 (Det. Viggiani); *see also id.* at 42–43 (ballistics report confirming a .32 caliber handgun used). He told Viggiani that he sold the gun to Hart a day or two after the Duncan shooting:

---

[1] The .38 caliber gun was not at issue during sentencing because it was inoperable at the time it was seized incident to Hart's arrest. *See* Sentencing Tr. at 132; Br. of Appellant at 3 & n.3; Br. of Appellee at 7.

**Q:** Who did you give it to?

**A:** A dude named Jay Rock. I think somebody called him Jason. His brother is Antoine Hart. I worked at the Palm Tree Café with him. Their little brother Justin got killed in DC and I don't know who did it. He was like 17 years old. I heard when the DC police had went to Jason's house he ran out with the guns or something and he got locked up.

**Q:** What did you get in return for the .32 from Jason?

**A:** $50.

**Q:** Did Jason tell you that DC police got the .32?

**A:** No, I never talked to him. I just heard he got locked up with two guns. He may have even gotten rid of the .32. I don't know.

**Q:** So did Jason have the gun, the .32, from about January 19th to the 20th, 2001, until April 18th, 2001?

**A:** I don't know. I guess he did, but he could have gotten rid of it.

**Q:** Can you describe Jason?

**A:** Black male about 20, 21 years old, about five foot ten to six one. Skinny, light brown skin. He wears his hair all kinds of ways; probably a bush. Has facial hair.

*Id.* at 36–37 (Det. Viggiani). When Viggiani showed Scott a photograph of Hart, Scott stated "That's Jay Rock. That's the one I gave the gun to. So that's Jason Hart, Jay Rock." *Id.* at 39–40 (Det. Viggiani).

*Second*, in early 2001 Hart lived in a section of Washington, D.C. known as Riggs Road and associated with a group of people from the same area. *See id.* at 19–22 (Det. Gray). At that time there was an ongoing dispute between the Riggs Road group and a group from the Fleetwood Village section of nearby Hyattsville, Maryland. *See id.* (Det. Gray). The dispute, or "beef," between the Riggs Road group and the

Fleetwood Village group manifested itself through several violent incidents. *Id.* at 20 (Det. Gray); *see id.* at 71–72 (Det. Jernigan). For instance, on February 21, 2001 Ricardo Seldon—a friend of Hart and a member of the Riggs Road group—was shot in the abdomen, apparently by members of the Fleetwood Village group. *See id.* at 14–15 (Det. Gray). The next day Anthony Grissett and Larry Lucey, two members of the Riggs Road group, allegedly robbed Gregory Wallace and Willie Smith at gunpoint. *See id.* at 15–18 (Det. Gray). Wallace was associated with the Fleetwood Village group but was friends with certain members of the Riggs Road group as well. *See id.* at 18 (Det. Gray); *id.* at 132–33.

*Third*, on February 25 two men shot and killed David Jones while Jones and his girlfriend were entering a vehicle. *See id.* at 65 (Det. Jernigan). Jones was in the Fleetwood Village area at the time but was not a member of the Fleetwood Village group. *See id.* at 132. Jones's girlfriend was unable to identify the shooters from a lineup but gave the police a general description of the two men. *See id.* at 65–68 (Det. Jernigan). Her description of one resembled Michael Freeman, another of Hart's friends and a member of the Riggs Road group. *See id.* at 67–68 (Det. Jernigan). The police recovered .32 caliber and .38 caliber shell casings from the scene of the homicide. *See id.* at 68–70 (Det. Jernigan). A ballistics analysis confirmed that the casings from the .32 caliber gun "matched" the .32 Colt that was in Hart's possession when he was arrested. *Id.* at 70 (Det. Jernigan).

*Fourth*, on February 26 Gregory Wallace was shot in Hyattsville. Detective Eckrich attempted to interview Wallace on February 27 but was unsuccessful because Wallace was heavily sedated and in pain. *See id.* at 93–94 (Det. Eckrich). Eckrich was unable to speak to Wallace until nearly two months later, at which time Wallace—when shown individual photographs of Hart and Freeman—identified the two as his attackers. *See id.* at 94, 99–100 (Det. Eckrich). The police recovered .38 caliber casings from the scene of the Wallace shooting. *See id.* at 68–69 (Det. Jernigan). A ballistics analysis confirmed that the casings were "consistent with" the .38 caliber casings found at the scene of the Jones

homicide. *Id.* at 73–75 (Det. Jernigan). Given that analysis, along with Wallace's statement and the statement of Jones's girlfriend, the police considered Hart and Freeman as suspects in the Jones homicide. The two men were also indicted in the Wallace shooting and were awaiting trial in Maryland at the time of the evidentiary hearing. *See id.* at 106–07 (Det. Eckrich).

## *B.*

The district court credited the testimony of Detectives Gray, Viggiani, Jernigan and Eckrich. *See id.* at 132. Finding nothing in the record to rebut Scott's hearsay statement and no evidence of bias on his part, the district court credited his testimony as well. *See id.* at 133–34. Applying a preponderance-of-the-evidence standard, the court found that Scott sold Hart the .32 Colt in late January and that Hart had the same gun in his possession when he was arrested on April 17. *See id.* at 137–38.

Because Hart claims on appeal that the district court failed to make clear the specific factual basis on which it rested its conclusion that a four-level enhancement was appropriate under section 2K2.1(b)(5), *see infra* Part II.C, we quote the court's pertinent statements at length:

> In terms of my conclusions. I've broken it down into sort of two parts. The first part is the link of the defendant's gun to a felony.
>
> They have a ballistics report that the .32 caliber bullets recovered from the Jones homicide on February 25th matched the defendant's .32 caliber gun recovered from the defendant on April 17th.
>
> [Second,] as to the link as to whether the defendant knew or somehow is associated or had knowledge that this .32 gun was used in a felony—in other words, we have the gun linked, but do we have the defendant—we have Mr. Scott's statement that on either January 19th or 20th—as I've credited, I've indicated why I could credit his statement—that he

sold, which is criminal conduct, this .32 caliber gun to the defendant. And we know that a .32 caliber gun was used by Mr. Scott in his shooting of Ms. Duncan.

And, as I said, we then have evidence that the defendant is involved in the beef between the Riggs Road and Fleetwood area.

We have the Wallace shooting where he identifies the defendant and Mr. Freeman, and I've indicated why I would accept that statement.

We have [Hart's] mother linking the defendant to the Riggs Road group through [Hart's] friends, and Mr. Seldon's shooting seems to start the beef.

We have links between the Jones and Wallace shooting, which are one day apart. It's circumstantial evidence. But the defendant is identified by Wallace and Mr. Freeman is also identified as the shooters.

Although it's not the .32 caliber gun, there is the same gun in terms of the .38[ ] shell casings that [are consistent] in the Jones homicide and the Wallace shooting. And, as I've indicated, there's two shootings in both — two shooters in both shootings.

So I would conclude — we're talking about a preponderance of the evidence. I don't think it's clear and convincing evidence, and it certainly isn't beyond a reasonable doubt, but whether it's more likely than not, I think that the defendant — *there's several possibilities*. The defendant used the gun in the Jones shooting *or* let someone else use it and got it back and would have known it.

We have the defendant had a .32 caliber gun that matches a shooting and, therefore, there's evidence that he had the gun before and after the shooting and he's involved in the surrounding incidents between those dates.

I would also note that even if the defendant, as [defense counsel] argues, acquired the .32 gun after

the Jones shooting, his involvement in the beef he would have reason to believe that it was used in the Jones shooting or one of these other instance [sic]. I mean, who would the defendant have acquired the gun from after the shooting?

So I think under the circumstances that there's enough — much of it is circumstantial as to the defendant's link. There's a clear link of the gun. But I think it's sufficient for a preponderance of the evidence. So I would grant the four levels.

Sentencing Tr. at 136–39 (emphases added). On January 24, 2002 the district court sentenced Hart to 82 months in prison and three years of supervised release and it imposed a special assessment of $100. *See* App. of Appellant at 50–57.

## II.

Hart timely filed an appeal of his sentence pursuant to 18 U.S.C. § 3742(a)(1) and (2), *see* App. of Appellant at 57–58, raising three challenges. In reviewing his challenges—which we address in turn below—we "accept the findings of fact of the district court unless they are clearly erroneous" and we "give due deference to the district court's application of the [G]uidelines to the facts." 18 U.S.C. § 3742(e); *see United States v. Yeh*, 278 F.3d 9, 13 (D.C. Cir. 2002). We review issues of law *de novo*. *See Yeh*, 278 F.3d at 13; *United States v. Drew*, 200 F.3d 871, 876 (D.C. Cir. 2000).

### A.

As noted, section 2K2.1(b)(5) of the Guidelines provides for a four-level enhancement

[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense . . . .

U.S.S.G. § 2K2.1(b)(5). Hart claims that section 2K2.1(b)(5) is inapplicable as a matter of law because the "[ ]other felony offense" to which it refers in this case, the homicide of David Jones, is not factually and temporally related to the offense of which Hart was convicted — unlawful possession of the .32 Colt.[2] We disagree.

Proceeding as we must from "the fundamental canon that statutory interpretation begins with the language of the statute itself," *Seattle Opera v. NLRB*, 292 F.3d 757, 761 (D.C. Cir. 2002) (quotation omitted); *see United States v. Cutler*, 36 F.3d 406, 408 (4th Cir. 1994) (interpreting section 2K2.1(b)(5) and declaring "the Sentencing Guidelines should be applied as written"), we acknowledge that at least one definition of the phrase "in connection with" lends support to Hart's view. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 481 (1993) ("connection" implies "cause and effect, logical sequence, mutual dependence or involvement"). We also recognize that section 2K2.1(b) is entitled "Specific Of-

---

[2] To illustrate his point, Hart provides an example of "another felony offense" he believes the Guideline would cover:

> Clearly, if Mr. Hart had been in the process of committing another felony when he was arrested for possession of a firearm, the enhancement would apply. If, for instance, on the date of his arrest Mr. Hart was dealing narcotics while in possession of the .32 caliber firearm, § 2K2.1(b)(5) would properly be invoked.

Br. of Appellant at 17. Hart goes on to state that "in all of the cases this court has reviewed involving § 2K2.1(b)(5), the trial court applied the enhancement to just [that] type of [scenario]." *Id.* (citing, *inter alia*, *In re Sealed Case*, 246 F.3d 696, 697–702 (D.C. Cir. 2001); *United States v. Bowie*, 198 F.3d 905, 907, 913 (D.C. Cir. 1999)). While his assertion appears to be correct, it is beside the point; the fact that we have had no occasion to address a case in which "another felony offense" is *not* temporally or factually related to the offense of conviction does not preclude us from applying section 2K2.1(b)(5) to such a case. *See* Br. of Appellee at 17 ("None of the cases cited [by Hart] actually addresses the question whether 'another felony offense' is limited to the offense of conviction.").

fense Characteristics," i.e., the circumstances that attend the offense of conviction. *See generally* U.S.S.G. § 2K2.1(b); *see also, e.g.*, *id.* § 2K2.1(b)(1) ("[i]f the offense [of conviction] involved three or more firearms," court should increase offense level according to graduated enhancements listed in accompanying table); *id.* § 2K2.1(b)(3) ("[i]f the offense [of conviction] involved a destructive device," court should increase offense level by two). Not all of the language found in section 2K2.1(b)(5) supports Hart's reading, however; the fact that the provision incorporates the phrase "another felony"—meaning a felony "that is different [or] *separate*," WEB-STER'S THIRD, *supra*, at 89 (defining "another") (emphasis added)—seriously undermines his interpretation. Nor are we the first court to consider whether section 2K2.1(b)(5) requires an identity—or at least a tight factual or temporal link—between the offense of conviction and "another felony offense." In *United States v. Sanders*, 162 F.3d 396 (6th Cir. 1998), for example, the Sixth Circuit reasoned that

> a logical reading of the § 2K2.1(b)(5) Guideline term "another felony offense" would … *require*, as a condition precedent to the application of a major four level [G]uideline enhancement, a finding of a *separation of time* between the offense of conviction and the other felony offense, or a *distinction of conduct* between that occurring in the offense of conviction and the other felony offense. Otherwise, the word "another" is superfluous, and of no significance to the application of that provision.

*Id.* at 400 (footnote omitted) (emphases added); *see Qi–Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995) (reaffirming "endlessly reiterated principle of statutory construction … that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage"). Likewise, in *United States v. Draper*, 24 F.3d 83 (10th Cir. 1994), the Tenth Circuit rejected in no uncertain terms the same argument Hart proffers today:

> [C]ounsel suggests that [U.S.S.G. § 2K2.1(b)(5)] does not permit a four-level enhancement of a base offense level where the other alleged felony offense, in our case drug offenses, occurred "weeks or months prior to the offense of conviction which occurred on March 15, 1993." We do not agree . . . . The [G]uidelines do not require that the other offense occur on the same date as the offense for which the defendant was indicted and found guilty, or be otherwise closely related thereto.

*Id.* at 85. Significantly, the Tenth Circuit's interpretation has stood for nearly ten years without any effort by the Sentencing Commission—despite multiple amendments of other Guidelines provisions—to amend the provision to a different effect; this is reason enough not to break rank with our sister courts. *See United States v. Bruce*, 285 F.3d 69, 73–74 (D.C. Cir. 2002) (per curiam) (declining to adopt Guideline interpretation inconsistent with that of other circuits where prevailing interpretation was longstanding and "neither the Congress nor the Commission ha[d] done anything to call [it] into question"). We therefore conclude the Jones homicide qualifies as "another felony offense" under section 2K2.1(b)(5) even though it occurred "months prior" to Hart's arrest for possession of the .32 Colt. *Draper*, 24 F.3d at 85.

### B.

Next, Hart contends that the district court impermissibly shifted to him the burden of demonstrating that Scott's hearsay statement lacked the requisite indicia of reliability and that, in any event, the court erred in admitting the statement because it was, in fact, unreliable. Again, Hart's argument is unavailing.

At the evidentiary hearing, as Detective Viggiani began to read Scott's statement into the record, Hart's counsel interrupted and stated:

> Your Honor, just to clarify my lack of objection. I would just note that [the statement] is double hearsay, and obviously we can attack the credibility of both the hearsay declarant and the manner in which it was taken, but I just want to preserve that.

Sentencing Tr. at 35. And when the government finished presenting its case for the four-level enhancement, counsel for Hart asserted that

> [t]he government's evidentiary presentation was almost entirely hearsay, and under the [G]uidelines they are certainly entitled to present hearsay evidence at a sentencing hearing, but when they [do so] it's got to at least be reliable. And I think the evidence in this case, first of all, did not provide the necessary links.
>
> The government's only evidence that Mr. Hart possessed the .32 prior to April 17, 2001, was the hearsay testimony of, essentially, of Theodore Scott who, first of all, gave an incredible story about where he got the gun.
>
> I mean, he said he found it in a park in a paper bag and he gave an incredible story about why he was hanging on to it, which was that he was going to turn it into a gun buy back.
>
> As [Detective Viggiani] testified, he had . . . no way to verify or corroborate that information, and there is nothing to suggest that [Scott's] story about what he did with the gun after January 18th was any more credible. . . .
>
> I mean, there's no reason to believe that he was not the person involved and was just not trying to push it off on Jason Hart.

*Id.* at 119–20. The foregoing comments notwithstanding, the government contends that Hart never made a clear objection to the admissibility of Scott's statement and "certainly did not make any objection as to who bore the burden of establishing [its] admissibility." Br. of Appellee at 29. It argues, there-

fore, that we should review for plain error the district court's decision to admit the statement. *See id.* (citing *United States v. Robinson*, 198 F.3d 973, 979 (D.C. Cir. 2000)). We need not decide, however, whether Hart preserved his hearsay objection — the district court did not err, plainly or otherwise, in admitting Scott's hearsay testimony.

First, nothing in the record supports Hart's assertion that the court "found that the defense had failed to show 'evidence of bias on [Scott's] part specifically against Mr. Hart.'" Br. of Appellant at 31 (quoting Sentencing Tr. at 134). The court made no reference to what "the defense had failed to show." Indeed, the transcript page to which Hart refers reveals the court stated merely that "I . . . *have* no evidence of bias on [Scott's] part specifically against Hart." Sentencing Tr. at 134 (emphasis added). Neither this observation nor any other indicates the court shifted from the government to Hart the burden of proof as to the veracity of Scott's statement.

Second, it is well-settled that "[t]he district court's credibility determinations are entitled to the greatest deference from this court on appeal." *Carter v. Bennett*, 840 F.2d 63, 67 (D.C. Cir. 1988); *see* 18 U.S.C. § 3742(e) ("The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the [sentencing] witnesses. . . ."); *see also United States v. Anderson*, 881 F.2d 1128, 1142 (D.C. Cir. 1989) ("credibility determinations . . . are not for us to second guess"). No case of which we are aware suggests (much less holds) that deference is less appropriate where the sentencing court, as here, credits a hearsay statement as opposed to in-court testimony. *Cf.* U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial. . . ."); *Nichols v. United States*, 511 U.S. 738, 747 (1994) ("As a general proposition, a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." (quotation omitted)). The district court, therefore, had broad latitude to admit Scott's

statement. *See United States v. Rouse*, 168 F.3d 1371, 1376–77 (D.C. Cir. 1999) (deferring to sentencing court's conclusion that witness lacked credibility because "[a]lthough the evidence . . . might support a different conclusion, that possibility does not warrant a finding that the district court abused its discretion"). Nothing in the record justifies our disturbing the court's determination that Scott's statement was sufficiently credible to admit into evidence. As the government demonstrates, *see* Br. of Appellee at 31–32, Detective Viggiani was in fact able to corroborate much of what Scott said — through a statement given by Duncan and, more importantly, through ballistics evidence linking the .32 Colt to Hart, *see* Sentencing Tr. at 59 (Det. Viggiani). Those two indicia of reliability are enough to satisfy us that the court did not abuse its discretion in admitting the hearsay evidence.

## *C.*

Hart's remaining argument—that the district court failed to make clear the specific factual basis on which it rested its conclusion that section 2K2.1(b)(5) applied—gives us concern. As before, *see supra* Part II.B, the government contends that Hart failed to preserve his objection and that a plain-error standard of review applies, *see* Br. of Appellee at 19. We disagree. On receiving the probation office's initial presentence report, the government objected to the absence of a four-point enhancement pursuant to section 2K2.1(b)(5). When the enhancement was included in the final presentence report, Hart then objected. During the evidentiary hearing, after the government presented its case, Hart again objected to the enhancement on the ground that "the evidence just doesn't bear . . . out in this case" the application of the Guideline. Sentencing Tr. at 118. Although the government argues that "[a]t no time" during the hearing "did [Hart] object on the basis that the district court's findings were . . . inadequate," Br. of Appellee at 19 n.5, the lack-of-clarity argument Hart raises on appeal is essentially the same argument he raised during the hearing — that the facts (as they have been found and summarized by the sentencing

court) do not clearly "bear . . . out" the enhancement. Hart thus preserved his current contention, one that we find meritorious for the reasons discussed below.

\* \* \*

We have long required the district court to explain clearly the factual basis on which it relies in applying an enhancement to a defendant's base offense level. *See, e.g.*, *In re Sealed Case*, 108 F.3d 372, 374 (D.C. Cir. 1997) (per curiam) (requiring "detailed findings with respect to the evidentiary links tying a particular defendant to the amount of drugs for which the district court finds him responsible" under Guidelines (quotation omitted)); *United States v. Caballero*, 936 F.2d 1292, 1299–1300 & n.9 (D.C. Cir. 1991) (remanding to sentencing court "for clarification and application of the correct legal standard" where appellate court could not discern from findings whether "the evidence before the trial judge was insufficient as a matter of law to support a . . . downward adjustment"), *cert. denied*, 502 U.S. 1061 (1992); *United States v. Lam Kwong–Wah*, 924 F.2d 298, 307 (D.C. Cir. 1991) (remanding to sentencing court "for resentencing and for clarification of the factual findings" regarding Guidelines enhancement where appellate court "would have difficulty discerning from the paper record" what factual inferences sentencing court drew). In this vein, we have reminded district judges that

> [a]lthough it is easy to understand how a sentencing court, with knowledge obtained during plea proceedings or . . . after a lengthy trial, knows well the evidence that supports its sentence, on review that knowledge is not discernible except through specific findings. . . . Regardless how [knowledgeable] it is, the court must lay out its factual findings in detail sufficient to make clear the basis for the sentence imposed. . . .
>
> Ultimately, it is the district court's responsibility to ensure the clarity and thoroughness of its findings. As has the Seventh Circuit, we encourage the dis-

> trict court to "adopt the practice of setting forth [its] findings . . . in a sentencing memorandum in order to avoid needless misinterpretation by this court on appellate review." *United States v. Billops*, 43 F.3d 281, 289 (7th Cir. 1994), *cert. denied*, 514 U.S. 1030 (1995). If written findings prove too cumbersome, it nevertheless is essential that the district court enunciate its findings in detail sufficient to allow this court to conduct its review without struggling to find evidentiary links.

*United States v. Dudley*, 104 F.3d 442, 447 (D.C. Cir. 1997). Likewise, we have made clear that where the sentencing court suggests alternative factual bases to support an enhancement—one of which is legally sufficient and at least one of which is not—but does not plainly choose among them, the proper course on appeal is to remand to that court for clarification of its findings and application of the proper legal standard. *See United States v. Barry*, 938 F.2d 1327, 1333 (D.C. Cir. 1991) (citing *Caballero*, 936 F.2d at 1299–1300; *Lam Kwong–Wah*, 924 F.2d at 307); *cf. United States v. Hazel*, 928 F.2d 420, 422–23 (D.C. Cir. 1991) ("[A] reviewing court can review effectively a departure only if it is made aware of the justifications for that departure." (citing, *inter alia*, *United States v. Allen*, 898 F.2d 203, 204–05 (D.C. Cir. 1990))).

Here, as Hart contends, a remand is necessary because it is unclear whether the district court based its application of the section 2K2.1(b)(5) enhancement on a legally sufficient factual foundation. As we have seen, *supra* Part I.B, the court divided its conclusions into two parts, the first of which analyzed "the link of the defendant's gun to [another] felony." Sentencing Tr. at 137. At this step, the court was perfectly precise; it found, no more and no less, "that the .32 caliber bullets recovered from the Jones homicide on February 25th matched the defendant's .32 caliber gun recovered from the defendant on April 17th." *Id.* We can be certain from the foregoing statement that, in the district court's view of the facts, the "[ ]other felony offense" within the meaning of

section 2K2.1(b)(5) was, solely, the February 25 Jones homicide.

In proceeding to the second part of its inquiry—"as to whether the defendant knew or somehow is associated or had knowledge that this .32 gun was used in a felony[,] [or] in other words, we have the gun linked, but do we have the defendant," Sentencing Tr. at 137—the court seemed to believe a preponderance of the evidence placed Hart at the scene of the Jones homicide:

> We have links between the Jones and Wallace shooting, which are one day apart. It's circumstantial evidence. But the defendant is identified by Wallace and Mr. Freeman is also identified as the shooters.
>
> Although it's not the .32 caliber gun, there is the same gun in terms of the .38[ ] shell casings that [are consistent] in the Jones homicide and the Wallace shooting. And, as I've indicated, there's two shootings in both—two shooters in both shootings.

*Id.* at 137–38. So far, we believe the court found that Hart used or possessed the .32 Colt in connection with the Jones homicide. But the paragraphs that follow cast doubt:

> So I would conclude — we're talking about a preponderance of the evidence. I don't think it's clear and convincing evidence, and it certainly isn't beyond a reasonable doubt, but whether it's more likely than not, I think that the defendant — *there's several possibilities*. The defendant used the gun in the Jones shooting *or* let someone else use it and got it back and would have known it.
>
> We have the defendant had a .32 caliber gun that matches a shooting and, therefore, there's evidence that he had the gun before and after the shooting and he's involved in the surrounding incidents between those dates.
>
> I would also note that even if the defendant, as [defense counsel] argues, acquired the .32 gun after the Jones shooting, his involvement in the beef he

> would have reason to believe that it was used in the Jones shooting or one of these other instance [sic]. I mean, who would the defendant have acquired the gun from after the shooting?

*See id.* at 138 (emphases added). On reviewing these comments, we cannot with confidence conclude the court found that Hart used or possessed the .32 Colt in connection with the Jones homicide—a factual basis that would plainly support application of section 2K2.1(b)(5)—because this scenario (Scenario One) is only one of "several possibilities." Two other possibilities the district court posited are that Hart "let someone else use [the gun] and got it back and would have known it," Sentencing Tr. at 138 (Scenario Two), or that he "acquired the .32 gun after the Jones shooting" and "would have reason to believe that it was used in the Jones shooting or one of these other instance[s]" given "his involvement in the beef," *id.* (Scenario Three). Neither Scenario Two nor Scenario Three, however, is a sufficient basis on which to rest the application of section 2K2.1(b)(5). Neither triggers the text of the Guideline because, in each case, Hart was on the *ex post* end of the transaction. That is, in neither case could Hart be accused of "possess[ing] or transferr[ing] any firearm or ammunition with knowledge, intent, or reason to believe that it *would be used* or possessed in connection with another felony offense." U.S.S.G. § 2K2.1(b)(5) (emphasis added). As Hart points out, the provision's text "is prospective . . . rather than retrospective in scope" and is plainly "meant to punish more severely those defendants who enable felony crimes by providing others with weapons," not those defendants who acquire weapons that were previously used feloniously. Br. of Appellant at 26–27.

We acknowledge that Scenario Three is better characterized as a hypothetical than a finding. *See* Sentencing Tr. at 138 ("not[ing]" that "*even if* the defendant . . . acquired the .32 gun after the Jones shooting . . . he would have reason to believe that it was used in the Jones shooting" (emphasis added)). After all, just moments before positing Scenario Three, the court stated that it was crediting "Mr. Scott's

statement that on either January 19th or 20th . . . he sold . . . this .32 caliber gun to the defendant." *Id.* at 137. Accordingly—and despite the fact that the phrase "several possibilities" does not ordinarily mean only two—we are left with Scenarios One and Two as the possible findings supporting the court's application of section 2K2.1(b)(5).

As between Scenarios One and Two, it is impossible to tell which theory the district court adopted, or if it even adopted one to the exclusion of the other. The court stated that "[t]he defendant used the gun in the Jones shooting *or* let someone else use it and got it back and would have known it." *Id.* at 138 (emphasis added). The "or" in the preceding sentence is used in the disjunctive. At oral argument, the government suggested that it is legally immaterial whether Scenario One or Scenario Two served as the basis for application of the Guideline because either supports the four-level enhancement. Regarding Scenario Two, the government argued that the phrase "would have known *it*," *id.* (emphasis added), means that Hart let someone else use the .32 Colt knowing that it *would be used* in the Jones homicide and then "got it back" later. We are inclined to agree with Hart, however, that "the word 'it' in the phrase 'would have known it' is the use of the gun in the Jones shooting" and that, under Scenario Two, "Hart let someone else use the gun and got it back knowing that it *had been used* in the shooting." Reply Br. of Appellant at 4 n.2 (emphasis added). Hart's reading is more consistent with the structure of the sentence than is the government's interpretation. Moreover, the fact that the district court entertained Scenario Three at all—in the mistaken belief that a four-level enhancement would be appropriate if Hart had acquired the .32 Colt knowing it *had been used* in connection with another felony offense—makes Hart's reading of the court's finding more likely. In any event, while we may be in doubt about what the court found or understood, we know that it plainly *mis*understood the prospective nature of the Guideline; we must assume, therefore, that it made the same legal error regarding Scenario Two as it did Scenario Three.

In sum, because we cannot be sure whether the district court relied on Scenario One or Scenario Two as the factual basis for application of section 2K2.1(b)(5), and because the latter scenario does not support the four-level enhancement, a remand is required for clarification and for application of the proper legal standard. *See Barry*, 938 F.2d at 1333; *see also United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir.) (remanding for clarification because "[w]hatever the sentencing court intended to find or could have found, on the record before us we cannot conclude with confidence that it [correctly applied the] enhancement"), *cert. denied*, 534 U.S. 872 (2001).

## III.

While we do not and should not expect perfection, especially from oral findings, we have "encourage[d] the district court to adopt the practice of setting forth [its] findings . . . in a sentencing memorandum in order to avoid needless misinterpretation by this court on appellate review," *Dudley*, 104 F.3d at 447 (quotation omitted), and we do require a minimum quantum of "clarity and thoroughness" "sufficient to allow this court to conduct its review without struggling to find evidentiary links," *id.*; *cf. SEC v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943) ("All we ask of the [agency] is to give clear indication that it has exercised the [proper] discretion. . . . We are not suggesting that [it] must justify its exercise of . . . discretion . . . with artistic refinement."). The requisite quantum of precision is lacking here. We realize the district court will likely and promptly reinstate the four-level enhancement on the legally sufficient ground that "[t]he defendant used the gun in the Jones shooting." Sentencing Tr. at 138. In sending the case back, however, we are not "sticking in the bark of words." *Chenery*, 318 U.S. at 95. Rather, we are ensuring that the years of extra prison time Hart will likely serve for possessing a firearm he "used . . . in connection with another felony offense"[3] are not founded on a misreading of the Guidelines.

---

[3] Under the Guidelines, Hart's criminal history category is IV. *See* App. of Appellant at 56. His total offense level with the section

The district court's January 2002 judgment is reversed and the case is remanded for resentencing consistent with the instructions set forth in this opinion.

*So ordered.*

––––––––

2K2.1(b)(5) enhancement added is 23, *see id.*, a level mandating between 70 and 87 months in prison, *see* U.S. Sentencing Guidelines Manual ch. 5, pt. A (2002). Without the enhancement Hart's total offense level is 19, a level mandating between 46 and 57 months in prison. *See id.*

1

SENTELLE, *Circuit Judge, concurring*: While I join the balance of the court's opinion without reservation, I join the court's interpretation of United States Sentencing Guideline § 2K2.1(b)(5) only because I find compelling the court's concluding statement on the issue:

> Significantly, the Tenth Circuit's interpretation has stood for nearly ten years without any effort by the Sentencing Commission—despite multiple amendments of other Guidelines provisions—to amend the provision to a different effect; this is reason enough not to break rank with our sister courts. *See United States v. Bruce*, 285 F.3d 69, 73–74 (D.C. Cir. 2002) (per curiam) (declining to adopt Guideline interpretation inconsistent with that of other circuits where prevailing interpretation was long-standing and "neither the Congress nor the Commission ha[d] done anything to call [it] into question"). We therefore conclude the Jones homicide qualifies as "another felony offense" under section 2K2.l(b)(5) even though it occurred "months prior" to Hart's arrest for possession of the .32 Colt. *Draper*, 24 F.3d at 85.

I do not find compelling or even convincing the reasoning of our sister circuits. Contrary to the declaration in *United States v. Sanders,* 162 F.3d 396, 400 (6th Cir. 1998), that "a logical reading of the 2K2.1(b)(5) Guideline term 'another felony' would ... require ... a finding of a separation of time between the offense of conviction and the other felony offense...," no such logical necessity exists. It is perfectly possible, and indeed I think contemplated by the Guideline, that more than one felony can be going on at the same time. Given that, as the majority notes today, § 2K2.1(b) applies to "specific offense characteristics," rather than to the criminal history of the defendant, I think the appellant's position far more logical than that of the Sixth Circuit.

Nonetheless for the reasons set forth in the above-quoted language from the opinion of the court, I join its conclusion.