**UNITED STATES of America,**
**Appellee,**

v.

**Jeffrey M. ROBINSON, Appellant.**

**No. 98–3100.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 26, 1999.

Decided Jan. 18, 2000.

Evelina J. Norwinski, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was A.J. Kramer, Federal Public Defender.

Barbara A. Grewe, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, and John R. Fisher and Blanche L. Bruce, Assistant U.S. Attorneys.

Before: SILBERMAN, WILLIAMS, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Lacking schools for emotionally disturbed teenagers, the District of Columbia contracted for a new school to be run by someone with a criminal record and without any educational credentials. The someone was Jeffrey Robinson, a 26-year-old insurance broker. Despite having no college degree and no experience in education, he obtained a contract to found the Kedar Day School. His qualifications? He had once been a special education student himself. The District canceled the contract after discovering that Robinson had paid for fancy cars, a lavish party and other personal luxuries with city money earmarked for the school. A jury found Robinson guilty of ten counts of wire fraud, 18 U.S.C. §§ 2 and 1343, and one count of bank fraud, 18 U.S.C. § 1344. The district court imposed a sentence of 37 months, including a two-level upward adjustment for "abuse of a position of trust," U.S.S.G. § 3B1.3. It ordered restitution totaling $301,910.63. Robinson has appealed his sentence, contesting the abuse of trust enhancement to his sentencing level and the amount of restitution.

I

In August 1995, Robinson signed a contract with the District of Columbia Public Schools ("DCPS") to set up and operate a school for up to fifty emotionally disturbed students. Pursuant to its policy of providing appropriate, publicly supported education for emotionally disturbed students residing in the District, DCPS places such students in private schools when no adequate special education program is available within the school system. In such cases, DCPS pays the costs of tuition and related services for the private placement. *See* Presentence Report ¶ 4, at 3.

Under the contract with DCPS, Kedar was to educate the students and provide related services, including speech therapy, occupational therapy, physical therapy, clinical psychology and social work. *See* Presentence Report ¶ 6, at 4. Robinson negotiated for the school—which he named the Kedar Day School—to receive $15,000 per year for each student attending. Under the agreement, Robinson would bill DCPS for tuition costs by submitting invoices listing the number of students Kedar educated each month.

From the beginning, Robinson's agreement with DCPS was laced with fraud. To get the contract, he indicated that he had already secured a location for the school, when in fact no such agreement existed. Days before the school was set to open, Robinson arranged to lease part of a former DCPS school building. Robinson was able to secure that lease by having Kedar's business manager represent that Kedar had obtained the necessary liability insurance, another complete fabrication.

To pay expenses the school incurred before receiving payment, Robinson contracted with the Prinvest Corporation, a financing company, which allowed him to borrow money against the invoices submitted to DCPS. Prinvest would give Robinson 80% of the invoice amount, less its fees and DCPS would forward the checks directly to Prinvest. DCPS would turn over the remaining 20% to Robinson.

Robinson sent the first invoice to DCPS in September 1995, claiming 49 students attended Kedar that month. In fact, Kedar had at most 25 to 30 students that month but Robinson told the secretary who prepared the invoice to raise the number so that the school would have "start up funds." For each of the invoices that followed, Robinson also had the secretary inflate the number of students. Invoices submitted by Kedar during the months it was in operation totaled $407,900, all of which DCPS duly paid.

Very little of that money went to school expenses. Two days after Prinvest wired its first payment of approximately $60,000 to Kedar's account, Robinson withdrew nearly three quarters of that amount for personal expenditures, including lease payments on two Mercedes Benz automobiles, a Ferrari, and a BMW. Meanwhile, Robinson told the Kedar staff he lacked the money to pay them, blaming the D.C. government for the hold up, and refused to hire the professional counseling staff the contract required. In October, Prinvest wired about $48,000 into the Kedar account, more than half of which Robinson spent on expenses unrelated to the Kedar School. In the months that followed, Robinson continued the pattern of siphoning off Kedar funds for his own expenditures. In December, he used money from the Kedar account to throw himself an expensive birthday party at the Four Seasons Hotel, inviting the Kedar staff to come and meet his "millionaire friends." School funds also went toward paying rent and a security deposit on an office for Robinson's insurance business.

Kedar's expenses continued to go unpaid; the staff began to leave and the students went unfed. On some occasions the children were sent home because of understaffing. At other times, the supervision was poor, so poor one student was seen leaving via an open window. At no time did Kedar provide the educational and counseling services required under the DCPS contract. The students at Kedar had severe psychological problems; among them were victims of sexual abuse, physical abuse and others suffering from a variety of behavioral disorders. In need of long term, intensive psychological services, they were supposed to receive psychological counseling, speech language therapy, and occupational and physical therapy. But unlike the idealized biblical village that must have inspired the school's name, see Song of Solomon 1:5 (King James); Isaiah 21:16 (King James), Kedar—as the government aptly describes it—was basically a "warehouse" for the children, with students and teachers "just sitting around." Brief for Appellee at 20.

Robinson's scheme finally fell apart in March 1996 after he persuaded Prinvest to allow him to pick up Prinvest's check for $47,000 from DCPS and deliver it to Prinvest's D.C. office. The check never arrived. Instead, Robinson convinced a teller at Industrial Bank that Prinvest was one of the companies he owned and deposited the check in Kedar's account. Failing to receive the check as promised, Prinvest ended its agreement with Robinson. Shortly thereafter, DCPS learned of the Prinvest incident, terminated its contract with Robinson, and took over operation of the Kedar school.

A federal grand jury indicted Robinson on eleven counts of defrauding the District school system. Ten counts related to the wire transfers to Kedar's account and one related to his theft of the Prinvest check. After a few hours of deliberation, a jury found Robinson guilty on the ten counts of wire fraud and on the following day, reached a guilty verdict on the bank fraud charge. At sentencing, the district court adjusted Robinson's base offense level upward nine levels, because the loss amount exceeded $350,000, see U.S.S.G. § 2F1.1(b)(1)(J), and another two levels for more than minimal planning, see U.S.S.G. § 2F1.1(b)(2)(A). Finding that Robinson had abused a position of trust, see U.S.S.G. § 3B1.3, the court added a two-level increase, bringing the total adjusted level to 19, with a range of 30 to 37 months. The judge sentenced Robinson at the top of the range, noting with regret, "I think that 37 months for this, for the crimes that were committed, is not significant enough.... If I had had the authority ... your sentence would be substantially more than 37 months—substantially more." As for restitution, the district court ordered Robinson to pay $301,910.63.

II

■ To comprehend Robinson's complaint about the two-level upward adjust-

ment for abuse of a position of trust, we need to look at the sentencing transcript. The critical passage is the one in which the sentencing judge adds up each of the enhancements to arrive at Robinson's adjusted offense level. Citing paragraph 27 of the presentence report, the judge imposed the two-step adjustment to the base offense level "because of Mr. Robinson's unique position as president of Kedar School, and because of that unique position, that significantly facilitated the commission of that bank-fraud count." The statement can only be interpreted in reference to the section of the presentence report the judge cited and earlier exchanges during the sentencing hearing. Although the presentence report is under seal, we can reveal that paragraph 27 recommends an adjustment pursuant to U.S.S.G. § 3B1.3 based on Robinson's abuse of his position at the Kedar School. Elsewhere the report strikes the same theme.

The government argued that Robinson should receive a two-level increase because of his unique position with the Prinvest Corporation, which facilitated theft of the $47,000 check. The judge went on to distinguish the government's position from that taken by the probation office in the presentence report, remarking that the two were not inconsistent. Later, when questioning the probation officer, the judge again inquired and was told that the two theories were not inconsistent. The phrasing of the judge's reasoning in imposing the enhancement makes sense in view of his focus on ensuring that the two theories were not at odds. His specific reference to the presentence report further signifies his reliance on the probation office's sentencing recommendations. We are therefore persuaded that the statement, imposing the adjustment "because of Mr. Robinson's unique position as president of Kedar School, and because of that unique position, that significantly facilitated the commission of that bank-fraud count," was intended to encompass both theories presented to the court.

■ The question is whether the enhancement was justified on either account. A two-level upward adjustment must be entered "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Application of the provision requires the sentencing judge to inquire "(1) whether the defendant occupied a position of trust; and (2) whether the defendant abused that position in a manner that significantly facilitated the commission or concealment of the offense." *United States v. West*, 56 F.3d 216, 219 (D.C.Cir.1995).

■ "Public or private trust," the commentary guidelines explain, "refers to a position of public or private trust characterized by professional or managerial discretion." U.S.S.G. § 3B1.3 application note 1. The position of trust must have made the detection of the offense or the defendant's responsibility for the offense more difficult. *See id.* It would apply, for example, to "a bank executive's fraudulent loan scheme" but not to a "theft by an ordinary bank teller" because that position is not characterized by professional or managerial discretion. *Id.* In *United States v. Shyllon*, we embraced the following factors to guide us in determining whether a particular position constitutes a position of trust:

> The extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendants' level of specialized knowledge; defendant's level of authority in the position; and the level of public trust.

10 F.3d 1, 5 (D.C.Cir.1993) (citing *United States v. Queen*, 4 F.3d 925, 928–29 (10th Cir.1993)). Using this approach, we conclude that as president of the Kedar School, Robinson did occupy a position of public trust.

The D.C. Public Schools selected Robinson to found and operate a school for its most severely emotionally disturbed students.[1] Paid for with city funds, the school was expected to fulfill the District's obligation to provide a free public education to all local school children. Parents of students attending Kedar rightly expected that their children would receive the education and counseling services they sorely needed. Because Robinson was the founder and director of the school, he gained the public trust of the community that Kedar served. *See United States v. Booth*, 996 F.2d 1395, 1397 (2d Cir.1993) (finding that status as a public school teacher constitutes a position of trust); *United States v. Pigno*, 922 F.2d 1162, 1164 (5th Cir.1991) (holding that school superintendent occupied a position of trust, making adjustment for abuse of public trust appropriate).

In that regard, the extraordinary level of discretion given to Robinson in managing the day-to-day operations and finances at Kedar is hard to believe, particularly in light of his non-existent qualifications. Kedar was located in a building separate from any of the District's other public schools. As a result, supervision of operations at Kedar occurred only through periodic visits from DCPS special education monitors. These monitors, who visited Kedar a total of three or four times, were responsible for assessing the school's compliance with federal law mandating that disabled students receive the educational and counseling services they require. *See* 20 U.S.C. § 1412. Monitoring did not include a review of Kedar's financial records. Robinson had full control over the invoices he submitted, enabling him to inflate the number of students with little fear of discovery. Further facilitating his scheme, Robinson had sole access to Kedar's checking account at Industrial Bank. He had complete discretion in hiring staff for Ke-

dar and in setting its curriculum. His authority over the school's employees was absolute. In his capacity as president of Kedar School, and in view of the broad managerial discretion that afforded, we find Robinson did occupy a position of public trust within the meaning of U.S.S.G. § 3B1.3. *See, e.g., United States v. Becraft*, 117 F.3d 1450, 1452–53 (D.C.Cir. 1997) (affirming abuse of trust enhancement where office manager's final authority over ordering and marketing activities facilitated scheme to defraud her employer).

Robinson abused that trust by misappropriating school funds and cheating emotionally disturbed children out of an education. Instead of paying for textbooks and school lunches, the DCPS money went toward promoting Robinson's profligate lifestyle. His scheme to defraud the District of Columbia government could not have been completed but for Robinson's position as president and founder of the Kedar School. He controlled the billing process, was subject to little supervision from DCPS, and was the only person with access to Kedar's account. By diverting the school's money to expenditures unrelated to Kedar, Robinson exploited the role entrusted to him, to the detriment of both the D.C. public schools and its neediest students. *See id.; United States v. Broumas*, 69 F.3d 1178, 1181–82 (D.C.Cir.1995) (holding bank director abused position of trust by using privileges of position to execute check-kiting scheme).

■ We are obliged to give due deference to the district court's application of the Sentencing Guidelines to the facts of this case. *See* 69 F.3d at 1180–81 (citing *United States v. Kim*, 23 F.3d 513, 517 (D.C.Cir.1994)). Doing so, we find the district court's decision to impose an abuse of trust adjustment on account of Robinson's position at the Kedar School wholly appro-

---

1. Students attending the Kedar School were classified by the District of Columbia State Education Agency as seriously emotionally disturbed. Categorized as Level 4 DCPS spe-

cial education students, they had needs that could not be accommodated by traditional neighborhood schools. *See* Presentence Report ¶ 5, at 3.

priate. Because affirmance on this ground is sufficient, we do not decide whether the circumstances surrounding conversion of the Prinvest check would similarly warrant a two-step adjustment.

## III

The district court awarded restitution in the amount of $301,910.63 to compensate the losses of DCPS and thirteen individuals. That amount, the government concedes, should be decreased by $13,000 to reflect money Robinson withdrew but later returned to the Kedar checking account. *See* Brief for Appellee at 45. Before oral argument, Robinson withdrew his objection with respect to the sum used for his personal expenses but still objects to the amount designated for unpaid rent and for victims other than DCPS. Robinson believes the money owed to Kedar employees and vendors should be paid out of the restitution awarded to DCPS; otherwise he claims, the court double counts these expenses.

■ His objections were never raised at sentencing. When he argued against restitution in the district court, Robinson objected only to his having to reimburse money that actually went toward Kedar School's expenses. That amount was not included in the restitution award approved by the district court. Robinson failed to refute the restitution figures, recited in the presentence report, regarding the individual parties and he did not contest the inclusion of unpaid rent and salaries. The judge was therefore permitted to rely on the figures set out in the presentence report without requiring the government to present additional evidentiary support. *See United States v. Booze*, 108 F.3d 378, 381–82 (D.C.Cir.1997). As a result, Robinson's objections on appeal are subject only to plain error review. *See* Fed.R.Crim.P. 52(b); *United States v. Wolff*, 195 F.3d 37, 40 (D.C.Cir.1999); *United States v. Saro*, 24 F.3d 283, 287–88 (D.C.Cir.1994).

■ Robinson's double counting argument does not make out a case of plain error. The DCPS contract was for educational services; hiring staff and procuring supplies was Robinson's responsibility. By violating that contract, Robinson now owes DCPS the amount it paid that was not used to provide the contracted-for-services. In other words, he must reimburse DCPS for all funds not used to educate students referred to the Kedar School. DCPS, by contrast, has no obligation nor agreement with Kedar's staff or vendors. Robinson alone is responsible for the losses of DCPS and Kedar's employees. It does not follow that DCPS should then pay the salaries and expenses of the Kedar School. For similar reasons, the unpaid rent should not be deducted from the diverted school expenses. The lease contract was independent of the school contract. As the government's brief rightly points out, had Robinson chosen to lease property not owned by the District, surely DCPS would not be held accountable for that property owner's loss. *See* Brief for Appellee at 17 n.12. Because Robinson cannot establish plain error, we uphold the order of restitution but direct that it be reduced by $13,000 to correct a computational error the government admirably has brought to our attention.

*Affirmed in part, modified in part.*