# United States Court of Appeals
## For the First Circuit

No. 15-1892

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN GEORGE, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Kayatta, Circuit Judges.

William J. Cintolo, with whom Thomas R. Kiley and Cosgrove
Eisenberg & Kiley, PC were on brief, for appellant.
Ryan M. DiSantis, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

November 7, 2016

**SELYA**, **Circuit Judge**. It is familiar lore that in Lord Acton's words, "[p]ower tends to corrupt, and absolute power corrupts absolutely." John Emerich Edward Dalberg-Acton, Historical Essays and Studies (1907). The circumstances of this case remind us of that venerable precept.

Here, the government charges that the defendant — an entrenched political satrap — used his political clout to divert federal funds granted to a state agency and, in the bargain, transgressed federal criminal law. A jury agreed and found the defendant guilty on charges of conspiracy and embezzlement from a federally funded organization. See 18 U.S.C. §§ 371, 666(a)(1)(A).[1] The district court sentenced the defendant to a 60-month term of immurement on the conspiracy count and a 70-month term of immurement on the substantive offense count (to run concurrently). As part of the sentence, the court directed the defendant to make restitution in the amount of $688,772. Later, the court ordered the defendant to forfeit an additional $1,382,214 in ill-gotten gains.

In this appeal, the defendant strives to challenge his conviction, his sentence, and the forfeiture order. After careful

---

[1] We use the term "embezzlement" as a shorthand. The statute of conviction, 18 U.S.C. § 666(a)(1)(A), criminalizes a range of nefarious activities, including embezzlement, theft, fraudulent obtaining, knowing conversion, and intentional misapplication of covered funds.

consideration of his asseverational array, we conclude that his variegated challenges to his conviction are without merit. We also reject his four claims of sentencing error, including one — a challenge to a position-of-trust enhancement — that requires us to address a question of first impression in this circuit. Finally, we do not reach his challenge to the substance of the forfeiture order because we conclude that the district court lacked jurisdiction to enter that order. Accordingly, we affirm his conviction and sentence, vacate the forfeiture order, and remand so that, once jurisdiction has reattached, the district court may address the question of forfeiture anew.

## I. BACKGROUND

"We rehearse the facts in the light most hospitable to the verdict, consistent with record support." United States v. Maldonado-Garcia, 446 F.3d 227, 229 (1st Cir. 2006). In the process, we draw all reasonable inferences from the evidence in favor of the verdict. See id.

Defendant-appellant John George, Jr., operated a bus system on behalf of a regional transit authority funded by the Commonwealth of Massachusetts and the federal government. This authority, known as the Southeast Regional Transit Authority (SRTA), is the governmental body responsible for providing transportation to certain cities and towns in southeastern Massachusetts. SRTA is strictly administrative: although it owns

the buses, facilities, and equipment used to run the system, it does not itself operate any buses. Instead, SRTA contracts with a private entity that uses SRTA's resources to operate and maintain the bus system. SRTA's advisory board, composed of representatives of the municipalities that it serves, selects this entity.

From 1980 to 1988, the defendant, a former Dartmouth selectman, served on SRTA's advisory board. In 1988 — after being elected to the Massachusetts House of Representatives — he resigned from that advisory board. Simultaneously, he arranged for his friend and political ally, Joseph Cosentino, to replace him.

The defendant resigned from the legislature three years later and purchased Union Street Bus Company (USBC). The defendant effected this purchase through a corporation known as Trans-Ag Management, Inc. (Trans-Ag). The defendant was the sole owner and sole employee of Trans-Ag, and — aside from paying the defendant's salary and contributing to his pension — Trans-Ag's only function was to serve as the nominal owner of USBC.

At the time of the purchase, USBC had a contract to operate the SRTA bus system through 1995. After the defendant assumed control of USBC, the contract was thrice renewed, the last renewal (for a five-year term) occurring in 2006 (the Agreement). The evidence of record supports an inference that the defendant maneuvered his way into the Agreement through collusion with Cosentino (by then, the defendant had lost the crucial support of

- 4 -

the City of Fall River, purportedly over his refusal to hire one of the mayor's cronies, and felt threatened by competition for the contract from a national company). Among other things, the defendant brought in a high bidder to make his own bid appear more attractive and furnished Cosentino with questions meant to discredit his main competitor's bid.[2]

Under the Agreement, USBC's expenses were, in effect, paid by SRTA with public funds: the Agreement bound SRTA to pay USBC the difference between USBC's operating expenses and USBC's operating income. Revenue from bus fares was USBC's exclusive source of operating income; its operating expenses included payroll, exclusive of the salaries of its corporate officers. In practice, this exclusion applied only to the defendant, as USBC had no other corporate officers. Withal, the Agreement specifically named the defendant as USBC's general manager, and SRTA separately paid USBC a management fee that gradually rose from $199,714 for 2006 to $266,711 for 2010. SRTA required preapproval of any capital expenditures proposed by USBC and funded approved expenditures as a distinct line item.

The proof adduced at trial indicated that the defendant misused USBC's funds (reimbursed by SRTA) in several respects.

_____

[2] In 2008, Cosentino was rewarded for his efforts: the defendant used his influence to secure a position for Cosentino as SRTA's administrator (a "no-show" job paying $95,000 per year plus substantial fringe benefits).

Three instances involved paying individuals for full-time USBC jobs while they worked instead for the defendant's (unrelated) personal business, a farm. Some details follow.

In 2010, USBC paid Sandra Santos, the defendant's girlfriend, approximately $100,000 in total compensation (reimbursed by SRTA). At that time, Santos was employed by USBC as either an "administrative assistant" or "assistant administrator" (the record is inconclusive as to which title obtained). In any event, she was only sporadically at her office between 2005 and 2011: though USBC's office hours were 8:00 a.m. to 4:30 p.m., she typically appeared only "once or twice a week, if at all" in the summertime. A USBC employee testified that he could not recall Santos ever having worked her allotted forty-hour week. By like token, workers at the defendant's farm testified to her daily (though not continuous) presence at the farm stand, where she worked as a supervisor, frequently during USBC's regular business hours. The evidence at trial permitted a finding that, from May to September of 2010, Santos was absent from her job at USBC for 370.25 hours, costing USBC (and, thus, SRTA) $17,772.

Roy Rocha, a night supervisor at USBC and a long-time friend of the defendant, would routinely abandon his shift shortly after arriving and take a company car to work at the defendant's farm or do personal chores for the defendant. Rocha's sole compensation for this work was his USBC salary (reimbursed by

SRTA). In 2010, the cost of that salary (including benefits) was approximately $90,000.

The record tells a similar tale with respect to Ronald Pacheco, a USBC mechanic. The defendant would peremptorily summon Pacheco from his USBC duties to do repairs at the farm. Additionally, Pacheco sanded and painted tractor parts belonging to the farm at the SRTA-owned garage using SRTA-owned equipment during his USBC shift. At USBC, the farm came first: when Pacheco's immediate superior (Al Fidalgo) asked to postpone Pacheco's assistance on a farm job to focus on urgent bus repairs, the defendant called Fidalgo's supervisor and insisted that Pacheco be sent to the farm forthwith.

There was more. In early 2006, USBC paid $10,000 in SRTA-reimbursable funds to Sousa Construction, ostensibly for terminal repairs. However, USBC's maintenance supervisor testified that he knew of no work done by Sousa Construction for USBC during that period. In addition, there was evidence that Santos and the defendant were then discussing remodeling the kitchen at the defendant's home, and that a Sousa Construction truck was seen there.

Other examples of the defendant's misuse of SRTA resources populate the record. For instance, the defendant used SRTA trucks to plow snow at both his home and his farm. So, too, SRTA equipment for repairing air conditioning systems on buses was

used by Pacheco at the defendant's farm. What is more, the defendant had Pacheco (during his USBC shift) install a SRTA-owned video surveillance system at the farm.

From the defendant's standpoint, matters began to unravel when Cosentino, having assumed the SRTA administrator post, got religion. He began pushing back (albeit gently, at first) against inappropriate uses of SRTA resources. When Cosentino went further and advertised the upcoming contract renewal in a national magazine, the defendant threatened to have him fired — a threat that materialized in September of 2010. Despite Cosentino's firing, SRTA awarded a new contract to a rival firm, thus ending the defendant's reign.

An investigation ensued. As a result, a federal grand jury indicted the defendant on August 5, 2014. The indictment charged the defendant with embezzling from an organization that receives federal funds, see 18 U.S.C. § 666(a)(1)(A), and conspiracy to commit an offense against the United States, see id. § 371. After a nine-day trial, the jury convicted the defendant on both counts.

On July 29, 2015, the district court sentenced the defendant to a 70-month term of immurement on the embezzlement count and a 60-month term of immurement on the conspiracy count (to run concurrently). The court ordered the defendant to pay

restitution in the amount of $688,772.  With the consent of both parties, the court reserved the question of forfeiture.

The court entered its written judgment on July 30, 2015, immediately after denying the defendant's post-trial motion for judgment of acquittal.  See Fed. R. Crim. P. 29(c).  The defendant filed his notice of appeal the following day.

On August 13, 2015 — while this appeal was pending — the district court held a hearing.  On September 21, 2015, the court amended its judgment to direct that the defendant forfeit $1,382,214.  The defendant did not file a second notice of appeal.

## II.  ANALYSIS

The defendant raises a gallimaufry of issues implicating his conviction, his sentence, and the forfeiture order.  We deal sequentially with the more substantial of these issues.  The defendant's other arguments are insufficiently developed, patently meritless, or both.  As to those arguments, we simply reject them out of hand, without further elaboration.

### A.  Sufficiency of the Evidence.

The defendant's flagship claim challenges the sufficiency of the evidence.  With respect to this challenge, we review the denial of his motion for judgment of acquittal de novo. See United States v. Chiaradio, 684 F.3d 265, 281 (1st Cir. 2012). Our basic inquiry is "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable

- 9 -

inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime."  Id. (quoting United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994)).

In this case, the government had to prove beyond a reasonable doubt that the defendant was acting as an agent on behalf of a state agency or organization; that he embezzled, stole, obtained by fraud, knowingly converted, or intentionally misapplied $5,000 or more of property belonging to or under the care, custody, or control of that agency or organization; and that the agency or organization received, in any one-year period, more than $10,000 in federal assistance.  See 18 U.S.C. § 666.  The defendant concedes that he worked on behalf of SRTA; that SRTA was (and is) a state agency or organization within the purview of the statute; and that it received more than $10,000 in federal assistance during each of the years in question.  The question reduces, then, to the sufficiency of the government's proof of the second element.

With respect to this element, the defendant asserts that the government did not prove that the salaries of his helpmeets were embezzled, stolen, obtained by fraud, knowingly converted, or intentionally misapplied.  He makes this assertion in the face of abundant evidence that these individuals were routinely absent from USBC's premises during their normal working hours and were

- 10 -

instead toiling at the defendant's farm. In the defendant's view, evidence of absence from the workplace is meaningless without evidence that the individuals were not getting their jobs done. After all, he surmises, they could have been doing their USBC work elsewhere or at other times.

We do not agree. Several witnesses testified to the work patterns of Santos, Rocha, and Pacheco, and the jury was well-situated to determine whether it was plausible that employees who worked a pittance of hours at USBC's offices while regularly laboring at the defendant's farm during ordinary business hours actually performed the USBC jobs for which they were being paid. The jury decided that it was not plausible, and we think that the record supports such an inference. See, e.g., United States v. Ransom, 642 F.3d 1285, 1291 (10th Cir. 2011); United States v. Sanderson, 966 F.2d 184, 186-87 (6th Cir. 1992).

In a variation on this theme, the defendant contends that employee salaries cannot be the res purloined under section 666 because the statute carves out a safe harbor for "bona fide salary" payments. 18 U.S.C. § 666(c). But this contention sweeps too broadly and promotes an interpretation of "bona fide salary" that would swallow the statute in a single gulp. Were this the law, a fraudster would only have to structure his loot as salary to evade prosecution. We hold, consistent with the plain language and evident purpose of the statute, that "bona fide salary" means

salary actually earned in good faith for work done for the employer. See United States v. Baldridge, 559 F.3d 1126, 1139 (10th Cir. 2009) (holding that work paid for by a county but done at a county official's private residence could not be a "bona fide wage"); United States v. Valentine, 63 F.3d 459, 465 (6th Cir. 1995) (rejecting bona fide salary defense under circumstances analogous to those present in the case at hand).[3]  Whether wages are bona fide is ordinarily a question of fact for the jury, see United States v. Cornier-Ortiz, 361 F.3d 29, 36 (1st Cir. 2004), and this case is no exception: the jury reasonably could have found that the salaries of USBC employees who were not only routinely absent from their posts during business hours but were also working at other jobs were not bona fide.

The defendant has one last shot in his sling. Noting that the government did not offer proof that the misused funds were spent on an "otherwise legitimate purpose," he argues that he could not be convicted under an intentional misapplication theory. This argument depends on a highly technical reading of our decision in Cornier-Ortiz, 361 F.3d at 36-37 — but it is a reading with which we need not grapple. The indictment did not charge solely

---

[3] The defendant's reliance on United States v. Harloff, 815 F. Supp. 618, 619 (W.D.N.Y. 1993), is misplaced. Courts have repeatedly distinguished Harloff in cases like this one, see, e.g., Baldridge, 559 F.3d at 1139; United States v. Williams, 507 F.3d 905, 909 (5th Cir. 2007); Valentine, 63 F.3d at 465, and we too regard it as off-point.

an intentional misapplication theory, nor was the jury instructed solely on such a theory. Rather, the indictment charged, and the court instructed the jury, in terms of all five potential means of violating section 666(a)(1)(A). Consequently, the jury's finding of guilt did not depend on a finding that the defendant intentionally misapplied the salaries in question. See United States v. Hernandez-Albino, 177 F.3d 33, 40 (1st Cir. 1999) ("When the government alleges in a single count that the defendant committed the offense by one or more specified means, the Supreme Court has 'never suggested that in returning general verdicts in such cases the jurors should be required to agree on a single means of commission . . . .'" (quoting Schad v. Arizona, 501 U.S. 624, 631 (1991))).

The defendant next submits that the government never proved that he embezzled $10,000 to remodel his kitchen. In this regard, he calumnizes the government for not calling the construction company owners as witnesses notwithstanding its suggestion to the court (when the record of the $10,000 expenditure was admitted into evidence) that it would do so.

The pertinent facts are straightforward. The evidence shows that $10,000 was paid to Sousa Construction, purporting to be for repairs at SRTA terminals. USBC's maintenance supervisor, however, testified that he did not know of any work done by Sousa Construction at any SRTA terminal during the relevant time frame.

The evidence further shows that — at about the time the check was issued — the defendant was discussing his kitchen renovation plans, and a Sousa Construction truck was spotted at his home. Though there is no smoking gun, there are matching bullet holes. Cf. United States v. Piper, 298 F.3d 47, 59 (1st Cir. 2002) ("[T]he government may satisfy its burden of proof 'by either direct or circumstantial evidence, or by any combination thereof.'" (quoting United States v. Gifford, 17 F.3d 462, 467 (1st Cir. 1994))). On this record, a rational jury could have concluded beyond a reasonable doubt that the $10,000 payment was for the defendant's personal kitchen renovations.

The defendant battles on, alleging that the government failed to prove that the use of equipment, such as SRTA plows or other resources, violated section 666 because (i) such uses were allowed by the Agreement, (ii) the government did not prove either the dates on which these events occurred or the monetary values assigned to each event, and (iii) the events, even if aggregated, could not cross the $5,000 statutory threshold. These allegations lack force.

For one thing, if challenged conduct is in fact illegal, a contract provision cannot ratify that conduct. See United States v. Mardirosian, 602 F.3d 1, 7 (1st Cir. 2010). For another thing, even without specific dates or precise values, evidence of the misuse of resources was relevant to the charged conspiracy. See,

- 14 -

e.g., Sanderson, 966 F.2d at 189. And at any rate, the district court rejected a proposed jury instruction requiring unanimity as to what property constituted the $5,000 necessary to cross the statutory threshold. The defendant has not challenged that ruling on appeal and, therefore, any argument on this point is waived. See DeCaro v. Hasbro, Inc., 580 F.3d 55, 64 (1st Cir. 2009). Since the statutory threshold is comfortably exceeded by either the bogus salaries or the wayward kitchen remodeling payment alone, the cost of the other items is irrelevant. See United States v. Cruzado-Laureano, 404 F.3d 470, 484-85 (1st Cir. 2005) (holding that two transactions totaling over $5,000 were sufficient for conviction under section 666 even if other potentially illegal transactions were ignored).

The defendant's final assault on the sufficiency of the evidence is a dead letter. The government alleged, among other things, that the defendant illegally sought a pension funded by SRTA and attempted to boost that pension by giving himself a generous raise in the final year of the Agreement. Before us, the defendant complains that the government's proof of these allegations was too thin.

Here, however, the district court eschewed any mention of the pension in its charge to the jury, and the government only obliquely alluded to it in its closing argument. Given the other evidence that we have discussed, the pension and salary increase

were immaterial to the jury's verdict.  Thus, any error in the admission of the evidence was manifestly harmless.[4]  See, e.g., United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012).

## B.  Constructive Amendment.

The defendant claims that a constructive amendment of the indictment took place at trial.  "A constructive amendment occurs '"when the charging terms of the indictment are altered" at trial so that they are different from those handed up by the grand jury.'"  United States v. Muñoz-Franco, 487 F.3d 25, 64 (1st Cir. 2007) (quoting United States v. Rodríguez, 215 F.3d 110, 118 (1st Cir. 2000)).  Because this claim was not made below, our review is for plain error.  See United States v. Brandao, 539 F.3d 44, 57 (1st Cir. 2008).  That review "entails four showings: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

There was no error in this respect, plain or otherwise. The jury convicted the defendant on exactly the same charges as

---

[4] We add that the district court's sentencing calculus (including its order for restitution) did not include either the unvalued use of SRTA resources or the increased pension.  In formulating the defendant's sentence, the district court did not include any proceeds of the fraud apart from Santos's salary, Rocha's salary, and the kitchen renovation payment.

were laid out in the indictment, which alleged in essence that the defendant misused SRTA funds and resources for his private benefit. In light of this congruence between the crimes charged and the proof at trial, the claim of constructive amendment necessarily fails. See United States v. DeCicco, 439 F.3d 36, 47 (1st Cir. 2006).

In an effort to blunt the force of this reasoning, the defendant insists that the government's emphasis gradually shifted from one means of violating section 666(a)(1)(A) to other means of violating that statute. But this insistence rings hollow. Where, as here, all of the means of violating the criminal statute are properly charged and that broad charge is not limited by a subsequent stipulation, the government's mid-trial decision to shift its emphasis from one means to another does not constitute a constructive amendment of the indictment. See id. at 45-46.

## C. **Jury Instructions.**

Next, the defendant claims that the district court erred in instructing the jury on mens rea. When — as in this instance — a party advances a preserved claim "that the court omitted a legally required instruction or gave an instruction that materially misstated the law, our review is de novo." United States v. De La Cruz, ___ F.3d ___, ___ (1st Cir. 2016) [No. 14-2132, slip op. at 24].

As said, there are five means through which section 666(a)(1)(A) may be violated. For two of them, the statute expressly states the necessary mens rea: to "knowingly convert[]" or "intentionally misappl[y]." 18 U.S.C. § 666(a)(1)(A). The statute is silent, however, as to the necessary mens rea for a conviction premised on one of the other three means (stealing, embezzling, or obtaining by fraud). Faced with this uneven statutory terrain, the court below instructed the jury on the meanings of "knowingly" and "intentionally," and then added that stealing means "to take someone else's money or property without the owner's consent with the intent to deprive the owner of the value of that money or property"; that embezzlement "means to intentionally take . . . [the] money or property of another after that money or property lawfully came into the possession of the person taking it by virtue of some office, employment[,] or position of trust"; and that obtaining by fraud "means to intentionally take something by false representations, suppression of the truth[,] or deliberate disregard for the truth."

The defendant argues that these instructions were deficient because the three statutorily unmodified acts (stealing, embezzling, and obtaining by fraud) all require a willful mens rea, which he defines as a "criminal, evil intent." The defendant cites no authority for his ipse dixit that these offenses always

- 18 -

require an explicit willfulness instruction.[5]  More important, his position defies common sense: the terms "steal," "embezzle," and "obtain by fraud" by their very nature imply a nefarious intent. See, e.g., United States v. Kucik, 909 F.2d 206, 212 (7th Cir. 1990) (recognizing that there is a "presumption evident in ordinary English usage that when one steals one does so with ill purpose").

Here, the district court's instructions clearly conveyed the criminal quiddity of these terms.  Consider, for example, its instruction (with respect to stealing) that when one "inten[ds] to deprive" another of property, he does not do so innocently.  So, too, the court's instruction with respect to obtaining by fraud made it pellucid that such means included "tak[ing] something by false representations, suppression of the truth[,] or deliberate disregard for the truth."

To say more on this point would be supererogatory.  We hold that the district court's instructions sufficiently covered the mens rea necessary to convict.  No magic words were required.[6]

_____

[5] The defendant's citation to Morissette v. United States, 342 U.S. 246 (1952), is far afield.  The Morissette Court held that when Congress uses a term of art with a traditional mens rea but does not mention intent, it does not follow that Congress eliminated the element of intent altogether.  See id. at 263.  That principle has no application where, as here, the challenged instructions do not strip away any traditional requirement of intent.

[6] As framed, the defendant's asseverations regarding mens rea also bleed into a conclusory suggestion that the indictment may have been duplicitous.  Because the defendant's briefs offer no

## D. **Sentencing.**

The defendant musters a panoply of claims of sentencing error. He submits that the district court incorrectly calculated the amount of loss attributable to the crimes of conviction and applied unfounded sentencing enhancements for sophisticated means, abuse of a position of trust, and role in the offense. Since these claims were preserved below, we review de novo "the sentencing court's interpretation and application of the sentencing guidelines, assay the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion." United States v. Ruiz-Huertas, 792 F.3d 223, 226 (1st Cir.), cert. denied, 136 S. Ct. 258 (2015).

1. **Amount of Loss.** The defendant's challenge to the sentencing court's loss calculation is easily dispatched. He maintains that the loss amount used in determining his guideline sentencing range wrongly included the salaries of Santos and Rocha as well as the $10,000 allegedly spent on the defendant's personal kitchen renovations. Each of these items, the defendant says, was insufficiently proved at trial.

This is old hat. We already have explained that the evidence was more than adequate to prove the challenged salaries

---

developed argumentation in support of this suggestion, we deem any claim of duplicitousness waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

- 20 -

and kitchen renovation payments.  See supra Part II(A).  It follows that this claim of sentencing error is hopeless.

**2.  Sophisticated Means.**  The district court enhanced the defendant's offense level by two levels for his employment of sophisticated means in the commission of the crimes, see USSG §2B1.1(b)(10)(C), citing the defendant's use of a shell company (Trans-Ag).[7]  In terms, a sophisticated means enhancement is warranted when a defendant has devised "especially complex or . . . intricate" methods of executing or concealing an offense.  See USSG §2B1.1, cmt. n.9(B).  The commentary to the sentencing guidelines identifies the use of "corporate shells" as a prototypical example of the type of sophisticated means that may give rise to the enhancement.  See id.  The district court found that Trans-Ag was just such a corporate shell.

The defendant demurs.  He argues here, as he did below, that Trans-Ag is not a shell company but, rather, is merely a holding company, necessitated by the structure of the Agreement.

The district court heard the parties' conflicting arguments on this point and considered evidence as to both the nature of Trans-Ag and the requirements of the Agreement.  The

_____

[7] In support of this enhancement, the government also points to the defendant's use of his political connections to control the bid process.  Because the defendant's use of Trans-Ag is itself sufficient to justify the enhancement, we need not delve into the government's other arguments.

court did not clearly err in finding that Trans-Ag was a shell company, not merely a holding company. As we have said, "where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous." United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990).

The short of it is that the defendant's scheme to defraud SRTA was both complex and intricate, and his insertion of Trans-Ag into the mix was just one manifestation of this complexity. It is, moreover, clear that he used Trans-Ag both to facilitate and to help to conceal his perfidy. We conclude, without serious question, that the defendant's challenge to the sophisticated means enhancement fails.

**3.   Position of Trust.**   The defendant's next plaint relates to the two-level enhancement imposed by the district court for abuse of a position of trust. See USSG §3B1.3. To justify this enhancement, a sentencing court must find that the defendant held a position of public or private trust and that he used the position to facilitate or conceal his offense. See United States v. Pacheco-Martinez, 791 F.3d 171, 178 (1st Cir. 2015). Here, the district court found that the defendant, as the person in charge of the affairs of a closely held corporation (USBC), occupied a position of trust with respect to SRTA and used that position to facilitate his embezzlement of SRTA's funds and resources.

Abuse is manifest, so the issue is whether the district court supportably found that the defendant occupied a position of trust at all. The defendant assails the district court's reasoning, declaring that his "status as an outside contractor" is not "a per se position of public or private trust." That is true as far as it goes — but it does not take the defendant very far. The court did not rely on a per se rule. Instead, it found that, on this record, the defendant, as the president of a contractor, occupied a position of trust vis-à-vis SRTA. In reviewing that finding, our analysis must proceed from the perspective of the victim. See id. at 178-79; United States v. Chanthaseng, 274 F.3d 586, 589 (1st Cir. 2001).

This court has not yet considered whether — or under what circumstances — a high-ranking employee of a government contractor can be said to occupy a position of trust vis-à-vis a defrauded government entity.[8] Still, we do not write on a pristine page. Other courts have recognized that a defendant can be found to have occupied (and abused) a position of trust vis-à-vis the

---

[8] In United States v. Sotomayor-Vázquez, 249 F.3d 1 (1st Cir. 2001), we affirmed a finding that the defendant (an outside consultant to a government contractor) occupied a position of trust when embezzling from the contractor. See id. at 19-20. But there, the contractor was the victim of the crime, and we addressed only whether the defendant's status as a consultant created a position of trust. That is at a considerable remove from this case, in which the district court found SRTA to be the victim and treated the contractor as the instrumentality through which the fraud was perpetrated.

- 23 -

government when he misuses public funds through a combination of control over a government contractor and a lack of government oversight. See, e.g., United States v. Robinson, 198 F.3d 973, 978 (D.C. Cir. 2000); United States v. Wright, 160 F.3d 905, 911 (2d Cir. 1998); United States v. Glymph, 96 F.3d 722, 728 (4th Cir. 1996). This construct recognizes a real world problem: individuals controlling government contractors sometimes grow so cozy with the contracting agency that they are allowed to exercise substantial discretionary authority over government funds without any semblance of meaningful oversight. In other words, a government agency sometimes may rely too heavily on a high-ranking employee of a contractor and thereby place that individual in a position of special trust.

To warrant the application of the position-of-trust enhancement in such circumstances, a defendant first must have both substantial control and significant discretion over the affairs of the government contractor. See Robinson, 198 F.3d at 978; Wright, 160 F.3d at 911. This is consistent with our case law, which teaches that "the requirement of managerial or professional discretion is 'paramount'" in regard to the position-of-trust enhancement. United States v. Sicher, 576 F.3d 64, 76 (1st Cir. 2009) (quoting Chanthaseng, 274 F.3d at 589)

Of course, application of this enhancement may be supported by a showing that the government agency placed special

trust and confidence in the defendant.  Courts have treated a lack of supervision over the use of government funds as a proxy for a showing that the government agency placed special trust and confidence in the defendant.  To conduct this aspect of the inquiry, a court must ask "whether the victim reposed additional trust in the defendant by ceding its ability to confirm compliance with the contract, thus relying more heavily on the honesty of the defendant than an ordinary party to a contract would."  United States v. Nathan, 188 F.3d 190, 206 (3d Cir. 1999).

Applying this reasoning, courts have found positions of trust when, for example, the government allowed a defense contractor to self-certify that its shipments met the government's specifications, see Glymph, 96 F.3d at 728; when the defendant ran a school on behalf of a public school system with no corresponding oversight of the school's financial records and little oversight of its operations, see Robinson, 198 F.3d at 978; and when a government agency entrusted a coin supplier with carte blanche authority over substantial amounts of coins belonging to the agency, see United States v. Boyle, 10 F.3d 485, 489 (7th Cir. 1993).  In each of these cases, the agency imbued the defendant with broad power over the use of public funds through reduced oversight; and the use of that power to facilitate or control criminal activity, by a person who had control over the government contractor, was found to be an abuse of a position of trust.  See

Robinson, 198 F.3d at 978; Glymph, 96 F.3d at 728; Boyle, 10 F.3d at 489.

United States v. Nathan is a representative case. See 188 F.3d at 207. There, the Third Circuit affirmed a finding that the president of a defense contractor held a position of trust vis-à-vis a government agency, noting that he "held the highest position in the company," owned a controlling interest in the company, determined how his company "would fill the government contracts," and yet was allowed to operate without any effective governmental check on whether his company's work met government specifications because the government agency never appointed a quality assurance representative to monitor the contractor's performance. See id. at 206-07.

The record in this case shows beyond hope of contradiction that the defendant dominated USBC. Indeed, his iron-fisted control is open-and-shut. He was the sole owner of Trans-Ag (the shell company that, in turn, owned USBC); he served as USBC's president (indeed, he was its sole corporate officer); and he exercised virtually unfettered control over USBC's operations, including personnel and finances.

So, too, the record is replete with evidence from which a factfinder reasonably could infer that SRTA reposed special trust in the defendant. Thanks to his political connections, USBC's performance was subjected to almost no oversight by SRTA.

According to testimony at trial, the defendant "had exclusive and sole responsibility for" USBC's employees. He also had exclusive and sole responsibility for USBC's performance of a cost-plus contract in circumstances in which the contracting government agency had no idea which employee was doing what work. What is more, SRTA's lax financial monitoring allowed him to pay USBC employees with public funds to work on his private business and to use public funds to pay for his kitchen renovations. That the defendant held sway over SRTA is evident from the fact that — in violation of the Agreement — he was able to rebuff without consequence an auditor sent by SRTA to inspect USBC's records. Similarly, Cosentino admitted that when the defendant gave unsatisfactory explanations for questionable expenses, SRTA "would do nothing because of [Cosentino's] association and relationship with" the defendant.

In sum, the defendant's control over USBC was coupled with a lack of meaningful government oversight over USBC. This scenario ensured that SRTA ceded to the defendant its responsibility to oversee the use of public funds. See id. at 206. The upshot was that — as the district court supportably found — SRTA effectively placed the defendant in a position of trust. Viewed against this backdrop, the district court did not clearly err in finding that the defendant held and abused a position of trust with respect to SRTA.

**4. Role in the Offense.** The district court enhanced the defendant's offense level by four additional levels, finding that he was the organizer and leader of a criminal enterprise that included five or more participants. See USSG §3B1.1(a). The defendant challenges this enhancement, quarreling with the court's assessment of the size of the enterprise.

The sentencing guidelines call for a four-level enhancement when "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Id. To qualify as a participant, a person must be criminally responsible for the commission of the offense, but need not be either prosecuted for or convicted of the offense. See id., cmt. n.1; United States v. Bey, 188 F.3d 1, 10 (1st Cir. 1999). Since the defendant himself counts as one of the five participants, the court must identify at least four other participants to satisfy the numerosity requirement. See United States v. Tejada-Beltran, 50 F.3d 105, 113 n.9 (1st Cir. 1995).

The court below based the enhancement on a finding that the defendant (at a minimum) directed the actions of Santos, Rocha, Cosentino, Louis Pettine (Cosentino's predecessor as SRTA administrator), David Peixoto (USBC's comptroller), and Steven Robinson (USBC's outside accountant). Inasmuch as we conclude that the numerosity requirement is satisfied by the district court's findings with respect to the defendant, Santos, Rocha,

Peixoto, and Cosentino, we limit our discussion to those individuals.

That the defendant himself was a participant requires no elaboration. In addition, there was no clear error in finding Santos and Rocha to be participants. As explained above, see supra Part II(A), those two individuals accepted salaries funded by SRTA for work they did not do and, thus, knowingly furthered the criminal enterprise.[9] See United States v. McCormick, 773 F.3d 357, 360 (1st Cir. 2014).

Nor was there clear error in naming Peixoto as a participant. After all, there was ample evidence that he abetted the defendant's corrupt activities (for example, he sent a USBC technologist to the defendant's farm to investigate how SRTA-funded surveillance cameras could be installed at the farm stand). Moreover, Peixoto admitted to the grand jury that he willfully "failed to disclose to federal auditors that USBC employees . . . were absent from USBC during work hours and instead were working at [the defendant's f]arm." To cinch matters, he tried to cover up what had happened by "shredd[ing] USBC records and other documents around the time that [the defendant] lost the SRTA contract." No more was needed to ground the finding that Peixoto

---

[9] Although the district court did not identify Pacheco as a participant, his involvement was of the same nature as that of Santos and Rocha (albeit not to the same extent). Consequently, he too qualified as a participant.

was a participant.  See United States v. Starks, 815 F.3d 438, 441 (8th Cir. 2016) (holding that an "individual only needs to give 'knowing aid in some part of the criminal enterprise'" to be considered a participant (quoting United States v. Hall, 101 F.3d 1174, 1178 (7th Cir. 1996))).

Finally, we discern no clear error in the district court's conclusion that Cosentino participated in the criminal activities.  When the defendant was competing for the Agreement, Cosentino assisted him in undermining other bidders and said nothing to his fellow advisory board members about the defendant's machinations.  In return, the defendant arranged for him to succeed Pettine as SRTA administrator.  In that capacity, Cosentino turned a blind eye to the defendant's use of SRTA resources for improper purposes.  These actions give rise to an inference of complicity sufficient to ground a finding that Cosentino was a participant in the criminal activities.[10]  See McCormick, 773 F.3d at 360; see also United States v. Al-Rikabi, 606 F.3d 11, 14 (1st Cir. 2010) (describing participants as "complicit individuals").

---

[10] To be sure, Cosentino eventually got religion and began to resist the defendant's looting of SRTA resources.  Nevertheless, he willingly participated in the scheme during several prior years and, thus, could be found to be a participant for purposes of the role-in-the-offense enhancement.  See United States v. Guevara, 706 F.3d 38, 45-46 (1st Cir. 2013).

That ends this aspect of the matter.  We discern no clear error in the district court's imposition of the four-level role-in-the-offense enhancement.

### E.  Forfeiture.

The last leg of our journey takes us to the forfeiture order.  The defendant assigns error; the government counters that we lack appellate jurisdiction over this assignment of error.

The background facts are undisputed.  Following its pronouncement of sentence, the district court entered judgment on July 30, 2015.  That judgment did not contain any dispositive provision with respect to forfeiture, but it did note that the court was deferring any decision on forfeiture "with the consent of the parties."  The next day, the defendant filed his notice of appeal.

While the appeal was pending, the district court (on September 21, 2015) purposed to enter an amended judgment, which for the first time included an order of forfeiture.  The defendant neither amended his notice of appeal nor served a new notice of appeal.  Over three months later, the defendant submitted his opening brief on appeal.  In it, he attempted for the first time to challenge the forfeiture order.

The government argues that the forfeiture order is not properly before us: in its view, the defendant's failure to file a new notice of appeal after the entry of the forfeiture order

deprives us of jurisdiction to review that order. See, e.g., United States v. Casas, 999 F.2d 1225, 1232 (8th Cir. 1993). There is, however, an antecedent question that must be answered. Although neither party challenges the district court's jurisdiction to enter its forfeiture order, we have an independent obligation to explore that issue. See One & Ken Valley Hous. Grp. v. Me. State Hous. Auth., 716 F.3d 218, 224 (1st Cir. 2013). Our review of the district court's implicit conclusion that it possessed subject-matter jurisdiction to enter the forfeiture order is de novo. See United Seniors Ass'n, Inc. v. Philip Morris USA, 500 F.3d 19, 23 (1st Cir. 2007).

The question that concerns us is whether the pendency of the defendant's notice of appeal divested the district court of jurisdiction to enter the forfeiture order. In answering that question, we start with the abecedarian principle that once a notice of appeal is filed, the district court is divested of "authority to proceed with respect to any matter touching upon, or involved in, the appeal." United States v. Brooks, 145 F.3d 446, 455 (1st Cir. 1998) (quoting United States v. Mala, 7 F.3d 1058, 1061 (1st Cir. 1993)). This principle "derives from the notion that shared jurisdiction almost always portends a potential for conflict and confusion." Id. at 456. Accordingly, shared jurisdiction is limited to a "circumscribed cluster of situations,

the handling of which is not inconsistent with the prosecution of an appeal."  Id.

We need not tarry.  The defendant's notice of appeal was filed on July 31, 2015.  At that moment, the district court was divested of jurisdiction regarding "any matter touching upon, or involved in, the appeal."  Brooks, 145 F.3d at 455 (quoting Mala, 7 F.3d at 1061); see Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982) (per curiam) (explaining that "a notice of appeal . . . divests the district court of its control over those aspects of the case involved in the appeal").  This proscription extended to the court's attempt to introduce into the judgment, for the first time, a forfeiture order.  See United States v. Pease, 331 F.3d 809, 816 (11th Cir. 2003).

A close analogy is found in our recent decision in United States v. Maldonado-Rios, 790 F.3d 62 (1st Cir. 2015) (per curiam).  There, we held that the district court lacked jurisdiction, during the pendency of an appeal, to grant a sentence modification motion brought under 18 U.S.C. § 3582(c)(2).  See id. at 64.  In reaching that conclusion, we cited, inter alia, United States v. Distasio, 820 F.2d 20, 23 (1st Cir. 1987), for the proposition that "a docketed notice of appeal suspends the sentencing court's power to modify a defendant's sentence."  We added that the limited exceptions to the general rule that an appeal terminates a district court's jurisdiction all pertain "to district court orders that

concern matters unrelated to the 'substance of the decision' being appealed." Maldonado-Rios, 790 F.3d at 64 (quoting 16A Charles A. Wright et al., Federal Practice and Procedure § 3949.1, at 59 (4th ed. 2008)); accord United States v. Cardoza, 790 F.3d 247, 248 (1st Cir. 2015) (per curiam). The forfeiture order in this case does not concern a matter unrelated to the substance of the defendant's appeal. Thus, it falls within the general rule, not within the long-odds exception to it. See Pease, 331 F.3d at 816.

Our decision in United States v. Ferrario-Pozzi, 368 F.3d 5 (1st Cir. 2004), is not to the contrary. That decision addressed whether a district court retains jurisdiction, under Federal Rule of Criminal Procedure 32.2(e), to enter a forfeiture order despite the pendency of a notice of appeal.[11] See id. at 11. There — unlike in this case — the district court's original judgment included a statement that "forfeiture shall be no less than $2,000,000 to be determined at a hearing." Id. at 7. While the defendant's appeal was pending, the district court made a specific forfeiture award of $3,700,000. See id. at 8. We ruled that the pending appeal did not deprive the district court of jurisdiction to issue the award because the award could be considered "an amendment of an existing order under Rule 32.2(e),

---

[11] Rule 32.2(e) allows a court "at any time" to "amend an existing order of forfeiture to include" substitute property or subsequently located property. Fed. R. Crim. P. 32.2(e)(1) (emphasis supplied).

and thus within the jurisdiction retained by the court." Id. at 11. Put simply, our holding rested on the fact that forfeiture "was properly a part of the [initial] judgment." Id.

Here, there was no forfeiture order included in the original judgment, merely an allusion to the possibility that forfeiture might be ordered at some unspecified future date. The district court made clear both at the disposition hearing and in its written judgment that forfeiture remained an open, unresolved issue, and took no position as to whether forfeiture would be ordered at all. Under these circumstances, the pendency of the appeal deprived the court of jurisdiction to issue its amended judgment.

The fact that the parties consented to deferral of the district court's consideration of the forfeiture issue does not alter the jurisdictional calculus. A federal court's lack of subject-matter jurisdiction cannot be repaired by consent of the parties. See United States v. Horn, 29 F.3d 754, 768 (1st Cir. 1994) ("Parties cannot confer subject matter jurisdiction on either a trial or an appellate court by indolence, oversight, acquiescence, or consent.").

We add a coda. The district court was not powerless to address the issue of forfeiture despite the pendency of the appeal. It could have asked us to stay the pending appeal and remand in order to allow it to make that additional ruling. See Puerto Rico

v. SS Zoe Colocotroni, 601 F.2d 39, 42 (1st Cir. 1979); cf. Maldonado-Rios, 790 F.3d at 64-65 (discussing procedure to be used when district court wishes to act upon a motion that it lacks jurisdiction to address because of the pendency of an appeal (citing Fed. R. App. P. 12.1(a))). We commend this salutary procedure to district courts that wish to add forfeiture orders to sentences previously imposed.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we affirm the defendant's conviction and sentence, but vacate the order of forfeiture as improvidently granted (that is, as granted without jurisdiction). We remand so that the district court, once its jurisdiction has reattached, may consider the issue of forfeiture anew. We take no view, however, as to either the propriety or amount of a future order of forfeiture.

**Affirmed in part, vacated in part, and remanded.**